HON. DAVID JOHNSON,
HON. WARNER WING,
HON. SAMUEL T. DOUGLASS,
HON. GEORGE MARTIN, } JUDGES.
HON. JOSEPH T. COPELAND,
HON. NATHANIEL BACON,†
HON. SANFORD M. GREEN,

## THE PEOPLE vs. HORTON.

It is the settled rule in this State, that a party has no right to cross-examine witnesses, upon facts and circumstances not connected with the matters stated in his examination in chief.

One who is the mere agent of the husband for the purpose of detecting his wife's adultery, cannot justify the murder of the suspected adulterer by proof of his previous adultery with the employer's wife. Such proof being available, under certain circumstances, to the injured husband only. Upon the

---

* Hon. Abner Pratt was appointed Presiding Judge at this term.

† Hon. Nathaniel Bacon was appointed Judge upon the decease of the Hon. Charles W. Whipple.

trial, therefore, of one so employed, for the murder of the supposed adulterer, questions tending to show the alleged adultery are irrelevant.

*Semble,* That in a trial between other parties, the husband cannot, except in a few specified cases, be permitted to testify to facts which, if proved, would subject his wife to imprisonment.

The wife may now, by statute, hold property in her own name, and a deed of real estate may be made directly to her, without the intervention of a third person or trustee, and may contract, buy and sell, independently of her husband; but whether she may take conveyance and hold possession of real estate from her husband directly, *quere.*

It has been held that the wife, in the absence of the husband, is his agent for the purpose of exercising the usual and ordinary control over his property, unless it be expressly shown that he has constituted some other person his agent for that purpose; she has a right to enter and remain in her husband's house, if she does so without a breach of the peace.

The respondent, upon his trial for murder, sought to excuse the offence by showing the deceased a trespasser in the house where the offence was committed, and, to this end, put sundry questions to the witness touching the possession of the house: whether it was in the wife who had given the deceased permission to enter it, or in her husband. *Held,* that if the deceased was a trespasser, it could not justify the murder; that the question of possession was immaterial, and the interrogatories touching it properly ruled out.

Case made, and bill of exceptions from Calhoun Circuit Court.

The respondent was indicted jointly with one Increase A. Pendleton and one John K. Byers, at the November term of the Calhoun Circuit for the year 1855, for the murder of John A. Wiley. He was tried separately upon the plea of not guilty, before the Hon. Abner Pratt, Circuit Judge, at the November term, 1855, and was found by the jury guilty of murder in the first degree.

Exceptions were taken to the rulings of the Court made during the progress of the trial, and to certain portions of the charge of the Court to the jury. The bill of exceptions was brought into this Court for review, and from it the following facts appear:

One Reuben W. Pendleton owned a house and lot in the village of Marshall, which he and his wife had occupied for several years prior to the month of November, 1855. Hav-

ing difficulty with his wife, he made an agreement with her that they should separate and live separately. He was to convey to her by deed the house and lot. She, on her part, was to give back to him a mortgage for $700; was to take care of one of their children; and further, she was to apply for a divorce. The deed and mortgage were made accordingly, and deposited in the hands of a third person, to be delivered when the divorce should be obtained. This agreement was made about a week prior to the 13th day of November, 1855. Upon making it, Pendleton left the house, removed his desk, papers, and some other things, and went to his brother's to board, and from and after that time, made no provision for the support of his wife, nor did he afterwards lodge at the house. He appeared, in fact, to have wholly abandoned his wife, and left her in the peaceable possession and sole occupancy of the house.

Pendleton suspected there existed an improper intimacy between his wife and Wiley, the deceased, and on the 29th day of October preceding, had forbid Wiley the house. Afterwards, and about that time, however, he met Wiley at the railroad depot in Marshall, walked with him to the house, and there drank a glass of cider with him. Afterwards, on the 8th day of November, he saw Wiley at the house, but did not speak to him, nor did he request him to leave. It appears from the case, that Pendleton had employed the respondent, Horton, to watch his wife and Wiley, and to endeavor to catch them together.

On the night of the 13th of November, 1855, Wiley, the deceased, was at Pendleton's house, and went to bed in the chamber about eight o'clock in the evening. Sometime in the night Horton, the respondent, in company with Increase A. Pendleton and Byers, went to the house, broke in the front door, which at that time was locked, and entered the room where Mrs. Pendleton was. He then took a candle, went up stairs into the hall of the chamber, where he met

Wiley, the deceased, and shot him with a revolver, inflicting a wound of which he died some two days afterwards. Horton when at the outer door, before breaking it in, refused to give his name, or to make known to Mrs. Pendleton the nature of his business.

In order to fully show the decisions of the Court below, which were brought into this Court for review, it will be necessary to introduce a part of the testimony which was given on the trial.

William H. Pendleton was called as a witness for the People, who testified that about a week before the 13th of November, he had a conversation with Horton about a pistol, one of Colt's revolvers, which witness owned, and which was then in the drawer of his desk in the back room of the finishing shop where witness and Horton worked. Horton told witness that he was going to watch the house of Reuben W. Pendleton, to catch Wiley, if he could, in adultery with Pendleton's wife, and should like to take it. Witness told Horton he could have it, and thinks he told him what it cost, but as to that would not be positive. Four of the five barrels were at this time loaded. He did not see it after this until after the 14th of November, the day after Wiley was shot. It was then in the drawer where it was usually kept, and three of the four loaded barrels had been discharged. Horton did not say when he was going to the house of R. W. Pendleton, but said that the reason why he wanted the pistol was, that he had reason to believe Wiley and Mrs. Pendleton carried fire arms, and he wished to be as well armed as they were. *Said he would do it for old jour Pendleton, but for no one else.*

On the cross-examination of this witness, the counsel for Horton asked the following several questions :

"Do you know of Mr. Horton, after this conversation, watching R. W. Pendleton's house ?"

"Do you know of Horton's watching there at the house, the night after he had the conversation with you about the pistol?"

"Do you know of your own knowledge of Wiley's having fire arms in his possession on the night of the alleged murder?"

"Do you know that any person told Mr. Horton, at any time previously to his borrowing your pistol, that Wiley had pistols, and would shoot any person who came there to watch him?"

"Did Mr. Wiley tell you, that if Horton came there to watch him he would shoot him, and did you communicate that to Horton?"

"Do you know that R. W. Pendleton requested Mr. Horton to go to his house on the night of the alleged murder for the purpose of catching Wiley and others that might be there with his wife?"

To each and all of these questions the counsel for the prosecution objected on the ground that they related to the subject matter of the defence, and about which they had not interrogated the witness, and therefore were not competent questions on cross-examination of the witness, and that the cross-examination must be confined to the subject matter of the examination in chief.

The Court sustained the objection, and decided that on the cross-examination of the witness, the respondent must be confined to matters which had been inquired after on the examination in chief. To which ruling of the Court the counsel for the respondent excepted.

On the part of the respondent, Reuben W. Pendleton was called as a witness. On his cross-examination he testified, among other things, that some two weeks prior to the 13th of November, he entered into the agreement with his wife, before recited; that the deed and mortgage were executed and deposited with a third person, as above stated ; and that

since that time he had not lodged at the house, or provided anything for the support of his wife.

On the re-examination of this witness on behalf of the respondent, he stated that, after making this agreement with his wife, she refused to carry it out, and that he had never surrendered to her the possession of the house. He further testified that he left for Illinois, the last time, on Thursday afternoon. Before he left he saw the respondent at his brother's shop, and made an arrangement with him to watch Wiley; said he had traced him and his wife to Ohio and back, and wanted to catch them together if he could; told Horton he left Wiley at the house, and had no doubt he would lodge there that night; gave him the key to the east door, and told him to go in at that door; that the front door would be locked; told him he had better not go into the house alone — that he also told his brother Increase A. Pendleton that he had left the key with Horton, and asked him to assist if Horton should want him. That on the 29th of October he told Wiley that he did not want him to come upon his premises or about his house, and told him, in the presence of his wife, the reason—that it was because he suspected he was intimate with her. To which Wiley replied, "If I take a notion to come and see Kate, the devil can't stop me."

On his cross-examination, this witness further testified, that on the eighth day of November he saw Wiley at his house in the afternoon, in the dining room, talking with his wife; that witness went in, but did not order him out, or object to his being there, but went away and left him there without saying anything to him; that he did, sometime before the 8th of November, see Wiley at the Railroad depot, where he talked with him, locked arms with him, and invited him to his house, and did at his house drink a glass of cider with him on that day, but thought it was not in November.

The counsel for the respondent asked the witness the following questions :

" Had you, previous to that time (the 29th of October), observed any intimacy between your wife and Wiley ?"

" Had you, within a month previous to that time, seen Wiley and your wife in bed together ?"  To which questions the counsel for the prosecution objected on the ground of their being irrelevant to the matter in issue.  The Court sustained the objection, and the counsel for the respondent excepted.

The Judge charged the jury, among other things, as follows: " Several legal questions have been raised by the counsel for the accused, and upon which the Court is called upon to charge you ; although in settling the question of malice, the Court is unable to see any real materiality to them.  The Court charges that Pendleton, being in the possession of the house, and being the owner, he could legally control it, and at all times enter it himself or by his authorized agent, either by breaking doors and windows, and, that while in possession his wife at common law could not have, hold or legally claim any possession but his, and her only right of possession would be his.  And that during the continuance of his possession, he would have the same legal right to forbid a person from entering the house, that he would have to forbid a man from coming on to his lot or other premises, and that if a person should intrude himself into the house after having been forbid, he would, in the eye of the law, be a trespasser, and for which Pendleton might maintain an action of trespass.  But notwithstanding a man is the owner, and has been in possession and occupancy of a house for years, still he may release and surrender up that possession to another, and that, as the consideration of an agreement of separation and maintenance of the wife, a husband may legally, under the existing statutes of this State, by deed release and surrender up the possession to his wife.  Should

you, therefore, find this question material in the determination of the question of malice, then it will become your duty to look into the evidence, and see whether Pendleton did, in fact, before the fatal occurrence, in virtue of any such agreement, which was executed and carried into effect, release and surrender up to his wife the possession of the house ; and whether, pursuant thereto, he did, in fact, abandon the house, leaving his wife to procure her own living. In connection with this, the Court deems it a duty to say, that as a general legal proposition, the wife, without the imposition of any restrictions upon her by the husband, is in his absence, his lawful agent to take care of his affairs, and transact his business. This, however, would not, at common law, or under our statute, change the nature of his possession.

" A license to enter a dwelling may be either express or implied. It is express when the owner invites another to his house, or to call upon him or his family, or to ask a person to walk in who has appeared at the door, and knocked for admission ; and it may be legally implied from the fact of a person being frequently or occasionally in the house of another, and in the presence of the owner, without objection. And although a man at one time forbids another coming to his house, still he may subsequently revoke the command, and renew the license to enter it, and this renewal may be express or it may be implied. If this question should also become material as a matter of fact in the determination of the main question in the case, the question of malice, you must look into the evidence, and see whether there was a renewal of the license to Wiley to come to the house after Pendleton forbade him.

" There is no legal principle any more plain or any better settled, than that every act of an agent, in violation of the express and limited power under which he acts, is void as between himself and principal, or as between himself and third persons who may have been injured by his acts ; and that

the special power in such a case, will afford the agent no protection whatever. If Pendleton was at the time the owner and in possession, he could, as the Court has already charged you, enter in person or by his agent, by breaking in doors or windows. But the prisoner at the bar, as Pendleton's agent, had no rights or power in the premises, beyond the power conferred. If, therefore, he did any act injurious to the house unauthorized by the special power, he would clearly be liable to Pendleton for the injury, and for which Pendleton might have his action. But Pendleton could not invest the prisoner with any power that could legally authorize him to violate the rights or persons of others, or to commit the most ordinary breach of the peace. And what was that power under which the accused assumed to enter the house, in the manner he did, on the night of the occurrence? Did he follow this limited special power in what he did, or did he pursue a course in open violation of it? This you must determine by the evidence, in case it should, as a matter of fact, be found material by you, in the determination of the main question.

"The facts and circumstances upon which these several legal questions have been raised by the counsel, are material in the case just so far as they may tend, in your opinion, to establish or rebut the malice, and no further.

"Although Pendleton was in fact in possession: Wiley a trespasser: and although Horton had a general power from Pendleton to enter the house at any time, and in any manner that he pleased; and on entering had actually detected Wiley in the act of adultery with the wife of Pendleton, still, for that reason and no other, he would not have been legally justified in committing on Wiley the most ordinary assault and battery; and much less could he, for that reason, be justifiable, legally or morally, in taking his life.

"On the other hand, if Horton was in fact a trespasser in entering the house on that night, Wiley, for that reason, could

not have been legally justified in taking his life, or in making any unnecessary attack upon him, with a dangerous or deadly weapon, or otherwise. Therefore, as the Court is constrained to look at this case, the only important question in it for your determination on the evidence, is, whether the mortal wound inflicted by the accused, was made in self-defence, and necessary, in the eye of the law, for the protection of his own life ; or whether it was perpetrated with malice aforethought. Just so far, therefore, as any of the facts and circumstances, on either side, and to which the Court has particularly called your attention, or any other facts and circumstances legally in evidence before you, tend to prove or to disprove the malice, just so far they are indeed material, and should not be lost sight of by you, in the consideration of the case."

·The counsel for the respondent then made the following exception :

The respondent excepts to the said charge and direction of the Court, and particularly to so much thereof as charges, "that, as the consideration of an agreement of separation and the maintenance of the wife, a husband may legally, under the existing statutes of this State, by deed, release and surrender up possession of his real estate to his wife."

And also to so much thereof as charges that as a general legal proposition, "the wife, without the imposition of any restrictions upon her by the husband, is, in his absence, his lawful agent, to take care of his affairs and transact his business."

The counsel for the respondent then requested the Court to charge and instruct the jury that, "the possession of the wife of real estate of which the husband is the owner, is under all circumstances the possession of the husband."

The Judge refused so to charge, or to charge the jury otherwise than he had already charged them on that point.

*Hughes & Woolley* and *J. Van Arman*, for respondent.

The Court erred in deciding that the cross-examination must be confined to the subject matter of the examination in chief. (*Moody* vs. *Powell*, 17 *Pick.*, 499; 1 *Phil. Ev.*, 273; *Webster* vs. *Lee*, 5 *Mass.*, 336; *Merrill* vs. *Berkshire*, 11 *Pick.*, 273; *Jackson* vs. *Varick*, 7 *Cow.*, 238; *Varick* vs. *Jackson*, 2 *Wend.*, 201; 1 *Cow. & Hills Notes*, 730; *Fulton* vs. *Stafford*, 2 *Wend.*, 483; *Morgan* vs. *Brydges*, 2 *Starkie*, 314; *Rex* vs. *Brooke*, 2 *Starkie*, 471; *Phillips* vs. *Eames*, 1 *Esp. N. P.*, cases 357.)

The third, fourth, fifth and sixth of said questions did relate to the subject matter of the examination in chief, to wit : Horton's "reason to believe" that Wiley and Mrs. P. were armed, and the Court erred in excluding those questions on that ground.

The questions to the witness, R. W. Pendleton, excepted to, and ruled out by the Court, were competent, as tending to prove that Wiley was in the witness' house to commit adultery, and therefore a trespasser.

Also, as tending to prove that he was there in the act of a known felony, and subject to arrest by Horton, or any other person.

So much of the charge of the Court as declares that a husband, in consideration of an agreement for separate maintenance, may, by deed, release possession of real estate to his wife, is erroneous. A deed or other contract made by husband and wife, as contracting parties, is void at common law. (1 *Parsons on Con.*, 300; *Coke Litt.*, 112 *a;* *Reeves Dom. Rel.*, 89, 90; *Rogers* vs. *Rogers*, 4 *Paige*, 516; *Marshall* vs. *Rutton*, 8 *T. R.* 545; *Martin* vs. *Martin*, 1 *Greenl.*, 394; *Sweat* vs. *Hall*, 8 *Verm.*, 187; *Mercein* vs. *People*, 25 *Wend.*, 77.)

The possession of the wife is the possession of the husband under all circumstances. (*Regina* vs. *Whitehead*, 38 *E. C. L.*, 255; *Rex* vs. *Smyth*, 24 *E. C. L.*, 280; *People* vs.

*Plumstead*, 1 *Gibbs R.*, 467; *Roscoe Cr. Ev.*, 355; 2 *Arch. Cr. Pl. and Ev.*, 336, 334.

So much of said charge as states that, as a general legal proposition, the wife, without the imposition of any restrictions upon her by the husband, is, in his absence, his lawful agent to take care of his affairs and transact his business, is erroneous.

The wife can only act as agent for the husband when she has been legally authorized to do so. (2 *Bouv. Inst.*, 570, 571; *Taylor* vs. *Fisher*, *Cro. Eliz.*, 246; 1 *Parsons on Con.*, 288; *Benjamin* vs. *Benjamin*, 15 *Conn.*, 347; *Sawyer* vs. *Cutting*, 23 *Ver.*, 486; *Leeds* vs. *Vail*, 15 *Penn.*, 184; *Cobbett* vs. *Hudson*, 10 *E. L. & E.*, 318; *Story on Con.*, *Sec.* 96; *Montague* vs. *Espinase*, 1 *Car. & Payne*, 357; *Montague* vs. *Benedict*, 3 *B. & Cres.*, 635; *Atkins* vs. *Curwood*, 7 *Car. & Payne*, 760; *Spreadbury* vs. *Chapman*, 8 *Car. & Payne*, 371; 1 *Esp. R.*, 142.

*J. M. Howard*, Attorney General, for the People.

1. There was no error in the ruling of the Court below first excepted to. It was a question of discretion at what time during the trial it was proper to admit this evidence, if it was at all admissible. (*Phil. & Tren. R. R. Co.* vs. *Stimpson*, 14 *Pet.*, 463; *Ellmaker* vs. *Buckley*, 16 *S. & R.* 77; *Harrison* vs. *Brown*, 3 *Wash. C. C. R.*, 582; *Roscoe's Crim. Ev.*, *p.* 170, *note*; 1 *Greenl. Ev.*, § 445.) The questions ruled out were all *leading*. (*Roscoe*, *Ev.* 168.) In *Varick* vs. Jackson, 2 Wend., 166 (200, 201), and in Fulton Bk. *vs.* Safford (*Ib.*, 483), the question was whether the witness having been called by one party, and examined by him, could afterwards, when he was called by the opposing party, object to him on the ground of interest. The Court held he could not. (1 *Phil. Ev.*, 274; 1 *Cow. & H.*, *notes* 730.) The bill of exceptions showed that the evidence offered was not excluded, but it was not proper on cross-examination. The cases show that the

witness may be recalled by the cross-examining party, and the facts, if competent, be available for him. But in this case the prisoner did not again offer the evidence. He did not recall the witness. But the facts implied in these questions do not go to diminish in any degree the malice implied by law in the act of killing, and are, therefore, immaterial. It was for the jury to determine from the circumstances whether the act was malicious or justifiable, or excusable, and this they have done by their verdict. The Court excluded no evidence offered by the prisoner respecting the transaction itself; and there is no exception taken to that part of the evidence or of the charge of the Court.

2. It is contended that the evidence to the ruling out of which the second exception was taken, was competent, as tending to show that the deceased was at the house of R. W. Pendleton, on the night of the 13th of November, for the purpose of committing adultery with the wife of witness. In this view it was entirely immaterial. The only question is, Did Horton kill Wiley deliberately and willfully? Horton had no interest in the question whether Wiley had or was committing the offence alluded to, and the evidence does not, therefore, bear at all upon the question of malice in the prisoner. It was no provocation as to him. Had the witness found the deceased committing the overt act, the provocation might have sufficed to reduce the offence to manslaughter, but the question here proposed implied abundant time for the provoked party to cool. (*See Wheaton on Homicide,* 177, *and cases there cited*; 8 *C. & P.*, 182.)

3. That part of the charge of the Court to which the third exception was taken, was an abstract opinion and *immaterial;* and so the Court charged the jury. A wife having separated from her husband, he having renounced his marital rights, may contract in her own name, and may make a conveyance of her land. (4 *Greenleaf Cruise Dig.*, 26, *and note* 1; *Reeves Dom. Rel.*, *ch.* 8.)

The legal necessity of a trustee of lands for a married woman, is now obviated by the act of 1855 (*p.* 420), but the legal right of Mrs. Pendleton to the possession of the house independently of the husband, did not become a question in this case. The question was, whether the prisoner, when he met deceased in the chamber, shot him deliberately and maliciously, or whether he did it in self defence, which would make the homicide justifiable, or on a sudden provocation, which would render it excusable, and that question must be solved by a consideration of the facts which were found to have attended the act of homicide. The jury passed upon them all, and found the prisoner guilty. The ruling of the Court on this abstract point could not have prejudiced the defence, because the evidence offered did not tend to qualify the act of homicide, and whether Wiley or the prisoner, or both, were trespassers, could, upon the facts stated, have had no influence on the minds of the jury, except as settling the question of malice.

4. The fourth exception is also immaterial. The question as to the authority of the wife in such circumstances, is not raised by the bill of exceptions. The wife has a right to enter and remain in the husband's house, if she does so without a breach of the peace. (*Rex* vs. *Smith*, 24 *E. C. L.*, 279.) The instruction given by the Court, whether material or not, was correct (*Church* vs. *Sanders*, 10 *Wend.*, 79), but the verdict will not be set aside on account of an erroneous charge, if the error was such that it could do no legal injury. (*Short* vs. *the People*, 2 *Comst*, 103; *People* vs. *Wiley*, 3 *Hill*, 214.)

By the Court, BACON, J.

The first exception taken by the respondent on the trial, was to the ruling of the Judge, in not allowing him to interrogate the witness William H. Pendleton, on his cross-

examination, as to matters pertaining to the defence, which had not been inquired after on the examination in chief.

The rule as to the cross-examination of witnesses is not uniform. In some States of the Union it is held that when a witness is called and examined in chief, the opposite party may not only cross-examine as to the matters touching which he has already testified, but that he may examine him upon any new matter which is relevant, and thus introduce at once his defence. This seems to be the rule in Massachusetts, and perhaps in New York.

In other States a different rule prevails. In 16th Serg. and Rawle, 76, Ellmaker *vs.* Buckley, it was decided that a party could not, on a cross-examination, travel out of or go beyond the matters touching which the witness had already been examined. So, too, in 6th Serg. and Watts, 77, Floyd *vs.* Bovard, it was said by Gibson, C. J.: "It would be better that each party should call the witness to serve his turn, and make him his own for the time being, than to entangle the case in those distinctions with which the English Judges have surrounded it."

The same rule is laid down in 14 Peters R., 6, 30, Phila. and Tren. Railroad Co. *vs.* Stimpson. The Court say: "If every party had a right to introduce evidence at any time, at his own election, without reference to the stage of the trial in which it is offered, it is obvious that the proceedings of the Court would often be greatly embarrassed, the purposes of justice be obstructed, and the parties themselves be surprised by evidence destructive of their rights, which they could not have foreseen, or in any manner have guarded against."

In 1 Greenl. on Ev. § 445, after citing cases from 7 *Cow.*, 228, *and* 2 *Wend.*, 166, he says: "In the Supreme Court of the United States, the rule is well settled that a party has no right to cross-examine any witness, except as to facts and circumstances connected with the matters stated in his direct

11

examination ; and that if he wishes to examine him to other matters, he must do so by making the witness his own, and calling him as such in the subsequent progress of the cause."

In this State the same rule has, with very few exceptions, been adopted. Notwithstanding a different rule prevails in some of the States, still we are disposed to abide by the one which has so long been followed here, and which is well and accurately laid down in the cases which we have cited. It is certainly desirable not to mingle up, and thus confuse the testimony of the opposing parties. If the plaintiff first presents all his testimony, which he considers necessary to support his case, without allowing the defendant at the same time to offer a part or all of the testimony upon which he relies, and then the defendant presents the evidence which properly pertains to his defence, the line of separation is well kept up. No confusion is likely to follow ; and the jury, if there be one, will be less likely to fall into mistakes, or to overlook material facts. Nor do we see any objection whatever to this rule. It tends certainly to promote method and order—two cardinal points in presenting evidence to a Judge. The rule merely regulates the manner of the examination. The party loses no rights. He only postpones the time of introducing his witnesses. We therefore think that the Judge properly refused to allow the respondent to propose to the witness, on his cross-examination, the questions which are set out in the bill of exceptions.

It is to be observed that the Judge did not reject the evidence offered, if indeed any was offered. No opinion was intimated as to the materiality of the questions. The decision was, that on the cross-examination, the questions could not be asked. It is also worthy of observation, that at no subsequent stage of the trial was the witness recalled, and the same or like interrogatories proposed to him.

The second exception taken by the respondent, was to the decision of the Judge, in overruling as irrelevant two ques-

tions proposed to Reuben W. Pendleton, who was called as a witness on the part of the defence. The questions were, whether prior to the 29th of October, he had seen any improper intimacy between his wife and Wiley; and whether, within a month previous to that time (29th October), he had seen his wife and Wiley in bed together? These two questions were objected to by the prosecution, and the objection was sustained by the Court.

Admitting for a moment, that all which is implied in these questions is true, and could have been proved by the witness, still we do not perceive what bearings they could have upon the issue to be tried. The murder was alleged to have been committed on the night of the 13th of November. Horton was the person on trial; not Pendleton, the husband of the woman towards whom the questions were aimed. That which possibly might have been a shield to the husband, had he been charged with the murder, would not avail anything to Horton, who, in judgment of law, was a stranger, a mere volunteer in the commission of the murder; one who had no right to officiously substitute himself in the place of the jealous husband, and espouse his quarrel. There was no relation between acts which had taken place prior to the 29th of October, between Mrs. Pendleton and Wiley, both of them strangers and aliens to Horton, and the fatal acts of the 13th of November, between the respondent and the deceased. It is an utter fallacy to say, that if the respondent was the agent of Pendleton, to hunt out the adultery of the wife, and if he should find her in the very act, that therefore he could do all to the adulterer which an enraged husband might do, if he should fall upon the guilty parties by surprise.

It is true that cases can be found in which it is said, that if the husband discover his wife in the act of adultery, and should, while in the first transport of passion, kill the adulterer on the spot, he is guilty of manslaughter merely, and not murder. (8 *Car. & P.,* 187.)

As to the first of these propositions, the Legislature of this State (*Sess. L. of* 1855, *p.* 420), made a radical change of the common law, as to certain rights of husband and wife. She may now hold property in her own name, or a deed may be made directly to her, without the intervention of a third person or trustee. She may also contract, buy and sell, independent of her husband. It is not necessary for us to decide, in the view which we have taken of this part of the charge, nor do we decide whether the husband may, by deed, surrender up and release the possession to his wife. We barely allude to the Act above referred to, for the purpose of showing how far the Legislature has gone in permitting the wife to take a conveyance of property, the same as if she were unmarried.

As to the second proposition in the charge above referred to, it has been expressly held, in the case of Church *vs.* Sanders, 10 Wend., 79, that the wife was, in the absence of her husband, his agent for the purpose of exercising the usual and ordinary control over his property, unless it be expressly shown that he had constituted some other person his agent for that purpose. She has a right to enter and remain in her husband's house, if she does so without a breach of the peace. (*Rex* vs. *Smith,* 26 *E. C. L. R.,* 279.)

We do not, however, deem it necessary to make a decision even on this. Both these points are abstract propositions, which do not relate to the issue. The question to be tried was, whether Horton willfully and feloniously, with malice aforethought, took the life of Wiley. If there is any connection between the issue, and the points which are made by the respondent, it is too remote and too subtle to be perceived. Questions had been raised upon the trial by the respondent, touching the possession of the house in which the murder was alleged to have been committed : whether the husband or the wife was in possession, and also whether the wife was, in the absence of the husband, his agent to transact his

business. Both questions were foreign to the issue. Whether the deceased was or was not a trespasser, in entering the house, or whether he entered it with or without the permission of Mrs. Pendleton, could in no way or manner justify the respondent in shooting Wiley.

Both these parts of the charge, then, being upon immaterial and abstract propositions, an error, if indeed there be any, would not affect the verdict.

In Shorter *vs.* the People, 2 Comst., 202, the Court say : "An error of the Court concerning an abstract proposition, having nothing to do with the matters in hand, is not a sufficient ground for reversing a judgment. (*See Hayden* vs. *Palmer*, 2 *Hill*, 205; *Cow. & Hill Notes to* 1 *Phil. Ev.*, 787, 788.)

The fifth and last exception taken by the respondent, is thus stated :

The counsel for the respondent requested the Court to charge the jury, "that the possession of the wife of real estate of which the husband is the owner, is, under all circumstances, the possession of the husband."

The Judge refused to charge differently than what he had already charged. We think the refusal was right. He had already instructed the jury that, if Pendleton built the house, took possession and continued in the occupation of it, this was sufficient *prima facie* evidence of ownership and possession in fact, and *that, while in possession, his wife, at common law, could not have, hold or legally claim any possession but his, and that her only right of possession would be his.*

The only difference between the instruction which was given, and that which was asked by the respondent, consists in the qualifying clause, " *under all circumstances.*" The jury had been already instructed that the possession of the wife of the house, owned by Pendleton, was the possession of the husband, accompanied with the further statement that the husband could, by deed, surrender up the possession

to the wife. The respondent then asks the Court to instruct the jury, " that the possession of the wife of real estate of which the husband is the owner, is, *under all circumstances*, the possession of the husband."

The jury had, on this point, been already correctly instructed. Had the instruction which was asked for been given, it would have been saying, that to the general rule which had been already laid down, there were no exeeptions. And we are of opinion, that if there was no exception to the rule prior to the Act of 1855, there is now one created by that statute.

On a careful review of the whole charge, and of the rulings of the Court, we think the respondent has no reason to complain. All the evidence was fairly submitted to the jury, with the injunction to examine it, and see whether, in their opinion, it tended to prove or disprove the malice. We quote the concluding words of the charge :

" Just so far, therefore, as any of the facts and circumstances, on either side, and to which the Court has particularly called your attention, or any other legally in evidence before you, tends to *prove*, or to *disprove* the malice, just so far they are indeed material, and should not be lost sight of by you, in your consideration of the case."

We think there was no error in the proceedings of the Circuit Court for which a new trial should be granted.

Present, Bacon, Wing, Green, Copeland, Martin, and Douglass, J. J.

Douglass and Johnson, J. J., dissented.