## THE PEOPLE v. EMILY U. MARBLE.

*Murder—Evidence of Married Persons against each other as to Crimes Committed after Separation—Res Gestæ—Reasonable Doubt—New Trial—Complicity.*

A woman was on trial for a murder committed in an attack by herself and others upon her husband and some associates. The husband and wife had been living apart in great hostility, and divorce proceedings were pending. *Held* that the husband could testify to the facts of the murder; they had not come to his knowledge in the confidence of the marriage relation.

Evidence cannot be excluded for proving a distinct offense as well as the one on trial.

Three persons were attacked at once. One was killed outright, another was pursued, and all were fired at. The whole transaction lasted about two minutes. *Held* that in a trial for the murder it was competent to give evidence of the whole transaction as an entirety, including what happened after the killing as well as before.

Where there is a plain conflict of testimony and one side or the other must be believed without qualification, there is no room for a "reasonable doubt" and an error in defining it to the jury is immaterial.

New trial will not be granted for wrong instruction to the jury upon an abstract point not called for by the case and wholly ineffective.

Going armed and with a hostile purpose in the company of others and engaging with apparent unity of feeling and action in a homicidal affray, tends to show complicity with the rest.

Exceptions from Ingham. Submitted October 10, 1877. Decided January 15, 1878.

MURDER. The facts are in the opinion.

Attorney General *Otto Kirchner* for the People. Divorce removes the want of capacity to testify as between married persons, *Barnes v. Camack*, 1 Barb, 392; *State v. Jolly*, 3 Dev. & Bat., 110; *Ratcliff v. Wales*, 1 Hill, 63; *Dickerman v. Graves*, 6 Cush., 308; *Herrick v. Odell*, 29 Mich., 47.

*J. C. Shields* for defendant. A husband cannot testify against his wife after divorce, either at common law (Bish. Mar. & Div., § 624; *Monroe v. Twistleton*, App. to Peake's Ev.; *O'Connor v. Majoribanks*, 4 Mann. & Grang., 435; *State v. Dudley*, 7 Wis., 664; *Cook v. Grange*, 18 Ohio, 526; *Ratcliff v. Wales*, 1 Hill, 62), or under Michigan statutes (*Morrisey v. People*, 11 Mich., 341; *Grimm v. People*, 14 Mich., 306; *Knowles v. People*, 15 Mich., 413; *Dixon v. People*, 18 Mich., 84; *Parsons v. People*, 21 Mich., 509). One who is on trial should not be prejudiced by evidence tending to show him guilty of another offense, *Shaffner v. Com.*, 72 Penn. St., 60. As to the definition of "reasonable doubt" see *Bradley v. State*, 31 Ind., 504; *Anderson v. State*, 41 Wis., 430; *Jane v. Com.*, 2 Met., [Ky.], 30; *Hamilton v. People*, 29 Mich., 175. Being present at the commission of a crime does not necessarily make one an accomplice, 1 Russ. on Crimes, 627; *Cannaughty v. State*, 1 Wis., 159; *People v. Knapp*, 26 Mich., 112.

GRAVES, J. This is ·a case on exceptions certified before judgment. The defendant and one William Martin were charged as being present and aiding and abetting one Willard H. Chapman in the murder of Charles F. Ayres. The offense was laid November 12, 1876, at the town of Meridian, in Ingham county. July, 1877, she was tried separately and the jury convicted her of murder in the second degree.

The witness first offered by the people was John P. Marble. At the time of the homicide he was defendant's husband, but living separate from her and carrying on proceedings against her for a divorce from the bonds of matrimony. And a few days after the homicide, namely, December 29, 1876, the marriage was dissolved pursuant to his proceedings therefor, and the marital relation previously existing was entirely extinguished, and under these circumstances the counsel for the people claimed that he was as competent as any one to give evidence

against the defendant except as to communications from one to the other. But the defendant objected that he was incompetent to testify to any thing transacted during the marriage.

The court overruled the objection and decided that Marble was competent to give evidence of the charges in the information. He was accordingly sworn and examined. There was no controversy about the fact that Ayres was killed in the evening or fore part of the night of November 12, 1876, and on the farm of witness, situated about five miles from Lansing. The witness had lived on this farm with the defendant for several years prior to February 24th, 1876, at which time, however, he left it.

There were family difficulties and he was of opinion the defendant was unfaithful to him. She had obtained a lease of the farm from him and assumed to manage and control it. At the time of the homicide he was living by himself at Lansing and she was occupying the farm, and the alleged principal, Willard H. Chapman, who was her son by a former marriage, and her alleged co-abettor Martin, with whom she was suspected of being criminally intimate, were staying there with her.

The witness swore that about eight o'clock in the evening of November 12th, he, with Ayres and one Morley, left Lansing together in a buggy for his farm; that the object was to get proof of adultery between defendant and Martin; that they left the horse and buggy in a piece of woods about one hundred and thirty-five rods from the house and went on foot into the orchard near the house and sat down under an apple tree. Referring to a diagram he described their course thereafter and pointed out and explained their movements to places nearer the house and also described the observed doings of Martin and young Chapman, and then stated that himself, Ayres and Morley retired about eight rods to an elm tree and there sat down on some blankets and buffalo robes; that whilst in this position he noticed de-

fendant Chapman and Martin approaching and not more
than fifteen feet distant; that they seemed to discover
witness and his party, and that the latter instantly com-
menced getting up, "and quicker than you could think
they were in front of us and fired on us.    All I heard
her say was, 'Here they are; fire!'"

The counsel for defendant objected that it was not
competent for this witness to testify to any thing which
the defendant said or did on that occasion, on the ground
that she was then his wife.    The objection was overruled.

The witness further testified that the firing occurred
immediately after defendant's order; that Chapman fired
first, but the intervening time was only long enough to
enable this to be distinguished; that Ayres was "shot
dead" and Morley got up and started for the road.

The defendant's counsel objected to evidence of any
acts of violence then and there done against Morley,
and urged that according to the case shown by the wit-
ness the offense charged was completed by the death of
Ayres.    The court considered it admissible to give evi-
dence of the entire transaction, not to show defendant
guilty of Morley's murder, but to fix the character of the
homicide of Ayres, which occurred in the same affray,
and to show how and in what way the defendant was
connected, if at all, with the death of Ayres; and the
objection was overruled.

The witness then testified that immediately after
Ayres was shot Morley got up and started for the road
and defendant Chapman and Martin immediately pur-
sued him and fired upon him; that after they had gone
some two or three rods Morley turned and fired back;
that witness had remained at the tree, but seeing the
"three pitching into him"—Morley,—he went down to
relieve Morley, and on getting nearly up with them the
defendant said, "There's the old man; go for him," and
that they thereupon fired at him two or three times;
that Morley got away and started for the fence and wit-
ness turned to go the other way and was then struck by

some one and immediately after was wounded by a pistol shot; that Morley reached the fence at one place and he at another, and hearing firing, witness started to go where Morley was, and getting within eight or ten feet he heard defendant say to Chapman, her son, "Will, here's the old man; let's go for him;" that witness went up to Morley and spoke to him, but got no reply; that the whole affray lasted perhaps a couple of minutes; that he thinks defendant fired at him, and further, that she fired two or three shots; that he had a loaded revolver but did not fire at all. On cross-examination he stated that previous to the night in question he, together with Ayres and Morley, had been about the house on several nights; that on the occasion in question both Ayres and Morley were armed with revolvers, each having a seven shooter; that the night was very dark, neither moon nor stars being visible.

This reference to the evidence and some of the surrounding facts will sufficiently unfold the case to afford an intelligible view of the objections thus far mentioned.

Now it cannot be positively admitted that if Marble had been sworn and examined subject to the authority of the common law, his previous state of marriage with the defendant would have been adequate ground for precluding him from testifying to those matters he was allowed to testify to. At the time of the trial no marriage relation existed, and for the entire period which commenced several months before the events of the fatal night and extended to the divorce, the relation was practically ended. There was no association and no confidential intercourse or communication. There was no amity. They lived apart in a state of mutual distrust and hostility, and the events described by Marble were open and aggressive acts against him and his associates Ayres and Morley, and according to his representation of the circumstances it appeared that the defendant and Chapman and Martin were acting in concert in waging

the violence which was done.   In giving evidence, so far as he was permitted, of what occurred on the night of the homicide, he revealed nothing which had come to his knowledge in consequence of the marriage relation, or which had arisen or been confided in the sacred confidence or privacy of married life.   On the contrary, the facts he detailed were acts of force and violence directed against him and others, and in the presence of others.

There would seem to be some reason for contending that the case would not be subject to the general rule of the common law which will not allow divorced parties to testify against each other concerning matters which occurred during the continuance of the married state, but would be considered as standing on different ground and to be viewed as an exception.   *Chamberlain v. People*, 23 N. Y., 85; *Ratcliff v. Wales*, 1 Hill, 63; *Coffin v. Jones*, 13 Pick., 441; *Dickerman v. Graves*, 6 Cush., 308; *Aveson v. Lord Kinnaird*, 6 East, 188.   But whatever force the point suggested may be supposed to possess, it is quite unnecessary to seek aid from it here.

The statute of 1861, as previously considered by this court, affords a complete answer to the objections founded on the former relation between the witness and defendant.   Comp. L., §§ 5966, 5969.*

---

* (5966.) SEC. 99.  No person shall be excluded from giving evidence in any matter, civil or criminal, by reason of crime, or for any interest of such person in the matter, suit, or proceeding in question, or in the event of such matter, suit, or proceeding in which such testimony may be offered, or by reason of marital or other relationship to any party thereto; but such interest, relationship, or conviction of crime may be shown for the purpose of drawing in question the credibility of such witness, except as is hereinafter provided.

(5969.) SEC. 102.  A husband shall not be examined as a witness, for or against his wife, without her consent; nor a wife, for or against her husband, without his consent, except in cases where the husband or wife shall be a party to the record, in a suit, action, or proceeding where the title to the separate property of the husband or wife so called or offered as a witness, or where the title to property derived from, through, or under the husband or wife so called or offered as a witness, shall be the subject matter in controversy or litigation, in such suit, action, or proceeding, in opposition to the claim or interest of the other of said married persons, who is a

By the terms of the first of these sections Marble was rendered generally competent notwithstanding his former marital relation; and since the relation had ceased when he was called, and as the prosecution "was not in consequence of adultery," there was nothing to qualify his general competency save the exception in the second of the above named sections, providing that without the consent of both, neither husband nor wife during the marriage or afterwards shall "be examined as to any communication made by one to the other during the marriage." He was therefore competent at the trial and in this case to testify against the defendant without her consent as to any matter except such a communication, and no part of the evidence he was allowed to give was within the exception. No part of his testimony consisted of matter exposing anything written or spoken under the protection of matrimonial association. *Morissey v. People*, 11 Mich., 327; *Grimm v. People*, 14 Mich., 300; *Herrick v. Odell*, 29 Mich., 47.

The objection to the evidence adduced of what occurred on the occasion after the fall of Ayres cannot be sustained. That it was adapted in its nature to prove or help prove a distinct offense could be no ground for rejecting it if directly pertinent to the case on trial and exposed to no other objection. *People v. Doyle*, 21 Mich., 221; *Com. v. Briggs*, 5 Pick., 429; *Osborne v. People*, 2 Parker C. Rep., 583; *Haskins v. People*, 16 N. Y., 344; *Weed v. People*, 56 N. Y., 628; *Reg. v. Morey*, 1 Cox Crim. C. 236; *Rex v. Moore*, 2 Car. & P., 235; *State v. Harrold*, 38 Mo., 496; *State v. Braunschweig*, id., 587; *Mason v.*

party to the record in such suit, action, or proceeding; and in all such cases, such husband or wife who makes such claim of title, or under or from whom such title is derived, shall be as competent to testify in relation to said separate property and the title thereto, without the consent of said husband or wife who is a party to the record in such suit, action or proceeding, as though such marriage relation did not exist; nor shall either, during the marriage or afterwards, without the consent of both, be examined as to any communication made by one to the other, during the marriage; but in any action or proceeding instituted by the husband or wife, in consequence of adultery, the husband and wife shall not be competent to testify.

*State*, 42 Ala., 537; *Walker's Case*, 1 Leigh (Va.), 576; *Rex v. Clewes*, 4 Car. & P., 221; *Regina v. Cobden*, 3 Foster & Finlason, 833; *Brown v. Com.*, 76 Penn. St., 319; *Coleman v. People*, 58 N. Y., 555. The facts in question were substantial ingredients of the general occurrence, and were pertinent. The period between the commencement of the attack and its bloody close was very brief, and as the witness stated, not to exceed about two minutes. There was no intermission. The violence was continuous, and not in stages, and the affair was incapable of being separated into distinct onsets. The parts were a connected cluster of events, and they reciprocally served to color and characterize each other. The transaction was entire, notwithstanding it was made by those participating to cause more than one fatal result; and what occurred after the fall of Ayres was a part of it, and a part proper to be known to judge correctly concerning the precise criminal quality of the act which caused Ayres' death and the true relation, in the sense of criminal law, of the defendant to that act. *People v. Potter*, 5 Mich., 1; *Maher v. People*, 10 Mich., 212; *Brown v. People*, 17 Mich., 429; *Patten v. People*, 18 Mich., 314; *Hurd v. People*, 25 Mich., 405; *People v. Knapp*, 26 Mich., 112; *Lambert v. People*, 29 Mich., 71; *Wellar v. People*, 30 Mich., 16; *People v. Roach*, 17 Cal., 297; *Dunn v. State*, 2 Ark., 229; *Brown v. Com.* supra; *Com. v. Eaton*, 8 Phila., 428; *Heath v. Com.*, 1 Robinson (Va.), 735; *State v. Rash*, 12 Ired., 382; *Johnson v. State*, 17 Ala., 618; *Com. v. Sturtivant*, 117 Mass., 122; *Coleman v. People*, 58 N. Y., 555; *Chandler v. Allison*, 10 Mich., 460.

This disposes of the exceptions to evidence.

The circuit judge gave the jury the measure of belief they must entertain on the evidence to authorize them to find a verdict of guilty, and in so doing he told them they must be satisfied beyond a reasonable doubt. Having stated and repeated this rule, he proceeded to expound it in these terms: "What I mean by a reasonable doubt

is, that it must be such evidence as would satisfy you—as you would be willing to act upon in any of your own important concerns—your own business—such evidence as would satisfy you it would be proper for you to act upon in any of your own private concerns; that would be evidence that would satisfy you beyond a reasonable doubt. That is what this means." The defendant excepted to this explanation.

In many, if not most cases, such an exposition of the rule which in this State at least will generally be well enough understood without effort at analytical elucidation or explanation by analogies, would have to be considered misleading as well as inaccurate. But conceding its imperfection, it nevertheless seems plain that it could not have produced any practical consequence whatever in this case.

There was no chance for it to disturb the lawful operation of the recognized rule; nothing in the state of things which would allow a mere qualified belief, and hence there was no room for injurious effect. As to all but a very few incidents there was no controversy or any uncertainty whatever, and as to the few about which there was disagreement the evidence was all substantially direct and personal and was given by Marble and defendant. That he was present and was an eye and ear witness was admitted, and he testified that a certain train of facts took place and his version contained nothing improbable. The defendant made her statement, and in some respects it varied from his account and the event of the prosecution depended upon whether the jury would or would not believe her rather than him. They might do so; they could not believe both. The question was which was entitled to belief. It was entirely competent for them to believe him and disbelieve her if their understandings were honestly moved to that result in their investigation of the circumstances. But there was no ground in the nature of things for any middle position or qualified belief. If Marble was believable at all he

was so positively and not merely with some reserve more or less; and the inquiry as to whether he was believable or not was not such in its nature as at any step to involve a belief less implicit. The very nature of the case imposed this necessity. It caused this much to be inevitable and not merely probable, and the charge was very full and fair in regard to the right of the jury to disbelieve Marble, and the result was that they did believe him and his version, and the belief thus formed, considering to what it related and upon what it turned and by what it was engendered, could not have been subject to a "reasonable doubt" in their minds.

The judgment they formed was governed by a rule of mental action admitting no such qualification. Hence it cannot be conceived that they were conscious of any such doubt. Consequently the explanation complained of was something abstract and uncalled for by the case and was wholly ineffective. Being practically harmless no new trial should be granted on account of it. *People v. Scott,* 6 Mich., 287; *People v. Horton,* 4 Mich., 67–85; *People v. Wiley,* 3 Hill, 194; *Shorter v. People,* 2 Comst., 193; *People v. Lohman,* 2 Barb., 216–221; *People v. Gonzalez,* 35 N. Y., 49; *Com. v. McCarthy,* 119 Mass., 354; *Com. v. Barry,* 11 Allen, 263; *Com. v. Bailey,* 11 Cush., 415; *Harris v. State,* 47 Miss., 318; *Wilson v. State,* 3 Heisk., 278; *Ballew v. State,* 36 Tex., 98; *Stewart v. State,* 1 Ohio St., 66; *Sinard v. Patterson,* 3 Blackf., 353; *Cricket v. State,* 18 Ohio St., 9; *Kopitoff v. Wilson,* 1 Q. B. Div., 377. As already suggested, the defendant made her statement under the statute to the jury, and it tended to show that Martin was her hired man, and that about nine o'clock of the night in question he and her son Chapman commenced loading a wagon with barrels of apples to be ready for an early start for market in the morning; that she had gone to bed; that her son informed her one barrel of apples was missing and took a light to look for it; that he soon returned with Martin and informed her the barrel was found down the road at the sluice way, being about one

hundred and ninety-eight feet south of the gate in the lane leading to the house; that her son and Martin proposed to go down where the barrel was and watch and see who should come for it and "thus find out (as the record states it) who had been committing a number of larcenies during the summer to which they had not been able to get a clue;" that on account of "repeated disturbances about the house during the summer in the night time by firing pistols, shouting and blows upon the windows and doors," she and her son and Martin on going out at night went armed to defend themselves; that her son and Martin started for the apple barrel to watch, and she, being afraid to stay at the house alone on account of former disturbances, went with them; that in going they went by the usual course from the house to the place where the barrel was, and as they passed by a cherry tree there seemed to be some dark objects under it; that she inquired of her son what the objects were and he replied they were "stumps," and she rejoined, "No, there are no stumps there;" that her son then called, "Who's there?" on which three pistol shots were discharged at her party, whereupon her son fired "the shot-gun;" that what she and those with her did was in their necessary defense against the attack made by the others; that Marble hated her and had threatened to take her life; that he desired to regain possession of his farm; that he had once been convicted of assault and battery upon her, and that separate proceedings were pending against her son and herself and Martin for the murder of Morley in the same affair.

In giving his charge the circuit judge several times referred to the evidence given on each side and to the facts it tended to make out, and he instructed the jury in substance and effect that if they were satisfied beyond a reasonable doubt that the facts were as claimed by the prosecution it would be their duty to bring in a verdict against the defendant; but on the contrary, if they were not so satisfied, or if they thought the facts were as

claimed by the defense, that then it would be their duty to find the defendant not guilty.

These portions of the charge, with enough of the context to present them correctly, are too long to be here quoted. According to the record they truly recognized in their entirety the states of fact on each side which the evidence given was offered to show and conduced to make out, and fully and plainly covered them and were sufficiently favorable to the defense. We do not affirm their accuracy as against the people. It is enough at present that they did not err against the defense.

When the judge had finished what he had intended to say, the defendant's counsel addressed him as follows: "I want to call your honor's attention to one fact—that if the jury should find that the party went out to see who it was that came after the barrel of apples, and without any intent to kill anybody, and while they were going along, as stated by Mrs. Marble, they came upon the party, and Willard Chapman, without any knowledge on the part of his mother, and without saying a word in any way, suddenly took up his gun and fired, that her presence there would not make her guilty of itself." The judge thereupon observed that "the jury were to determine from the evidence and facts of the case whether she was there consenting to the transaction; that it was a question for them."

The failure to charge in the terms of this proposition of defendant's counsel is made a subject of exception. The response of the court was well enough. It submitted the point of her guilty participation on the whole evidence, and looking at the facts and the whole charge it is manifest the jury must have found as a distinct fact that she was criminally connected with the others, if not the leading assailant. The proposition assumed that the states of fact adduced in the case afforded a ground of charge for a finding that young Chapman, "without saying a word in any way," suddenly fired the fatal shot, and that the defendant was not privy to the

act nor otherwise connected with it than by being present as a spectator. It also implied that the sense of the jury might be required upon the question of her guilty connection with the affair without permitting them to consider and weigh the tendency to prove it of some of the admitted facts. The assumption was inadmissible. It was repugnant to the case made by the people and in direct contradiction of defendant's statement and solemn admission.

According to the case shown by the people's evidence, the defendant ordered the firing, and hence was necessarily privy to it; and according to her own claim and voluntary declaration, she and her son consulted together on the field concerning the "dark objects," and he thereupon called out, "Who's there?" at the instant before the firing, and therefore did not suddenly fire "without saying a word in any way." Whatever was said at the time and place among these persons was part of the transaction and could not be lawfully excluded from the jury.

It is next to be observed that several circumstances bearing on the question of her complicity were conceded. The hostility between her and Marble; the close connection and unity of feeling subsisting between herself, her son and Martin; their joint movements on the night in question, and as though marshaled to the place of the homicide; the fact that she went and was there armed with the other two; their conduct there as one band and the talk among them on the spot and at the very time were circumstances adduced by the defendant herself, and they had a tendency to show that she and those with her were combined and acting in concert, and that her will concurred in the commission of the violence which her associates perpetrated. *Brown v. Perkins*, 1 Allen, 89; 3 Greenleaf Ev., § 41; *Com. v. Lucas*, 2 Allen, 170; *Com. v. Fortune*, 105 Mass., 592; *Ruloff v. People*, 45 N. Y., 213, 217; *Kelley v. People*, 55 N. Y., 565; *Breese v. State*, 12 Ohio St., 146; *The King v. Cope*, 1 Strange,

144; *United States v. Cole and others,* 5 McLean, 513. Whether this tendency was more or less stringent is not the question. It is sufficient that the tendency existed, and it would not have been proper to have given the case to the jury on the question of her guilty connection with the affair under an implication that these admitted facts had no such tendency. *McDonough v. Miller,* 114 Mass., 94.

No other points have been urged, and a careful examination of the record discloses nothing of which the defendant has any reason to complain.

The exceptions should be overruled and the court should proceed to judgment on the verdict.

Let it be so certified.

CAMPBELL, C. J., and COOLEY, J., concurred. MARSTON, J., did not sit in this case.