MCNAMARA v. LANGGUTH.

1. HUSBAND AND WIFE—BANK DEPOSITS—PRINCIPAL AND AGENT—
EVIDENCE—SUFFICIENCY.

Evidence *held*, insufficient to show that the wife of a marine
engineer who received part of his wages during his ab-
sence, acted as his agent in creating a bank account in
her own name and in purchasing a home in her own
name from the proceeds.

2. EVIDENCE—ADMISSIBILITY—ORAL TESTIMONY—REAL PROPERTY—
TRUSTS.

Oral testimony cannot be resorted to in order to create a
trust in real estate.

3. USES AND TRUSTS—HUSBAND AND WIFE—OWNERSHIP OF PROP-
ERTY—EVIDENCE—SUFFICIENCY—STATUTES.

Under 3 Comp. Laws, § 8835 (3 Comp. Laws 1915, § 11571),
providing that where a grant for a valuable consideration
is made to one person and the consideration paid by an-
other, no use or trust shall result in favor of the person
by whom such payment shall be made, but the title shall
rest in the person named as alienee except when a trust
results in favor of creditors under the next section, and
section 8837 (3 Comp. Laws 1915, § 11573), providing that
section 8835 shall not extend to cases where the alienee
shall have taken the conveyance as an absolute one in his
own name, without the knowledge or consent of the person
paying the consideration, or when such alienee, in violation
of some trust, shall have purchased the land with money
belonging to another, no trust is created in a husband
where a wife takes title to real estate in her own name,
and it is not shown that the husband did not have knowl-
edge thereof and consent thereto and that the considera-
tion was paid by the husband.

4. SAME.

Where a wife prior to her marriage had been personally en-
gaged in business and during her married life deposited
her own money and that received by her as agent for her
husband in a bank account in her own name, a finding as
to what portion of the bank account belonged to the hus-
band and what belonged to the wife would be based upon
mere conjecture.

Appeal from Wayne; Collingwood, J., presiding. Submitted October 8, 1917. (Docket No. 48.) Decided December 27, 1917. Decree modified on motion for rehearing July 18, 1918.

Bill by Michael McNamara against Josephine Langguth and others to quiet title. From a decree dismissing the bill, plaintiff appeals. Affirmed, without prejudice to an action at law.

*James H. Pound,* for plaintiff.

*Charles P. O'Neil,* for defendants.

BROOKE, J. On December 12, 1892, plaintiff, who was then a widower with three living children, intermarried with one Margaret Merritt. He and said Margaret Merritt McNamara continued to live together as husband and wife until March 14, 1915, when she died, intestate. It appears that at the time of the death of said Margaret McNamara, the title to a house and lot which had been used by her and her husband, the plaintiff, as a home since April 20, 1910, stood in her individual name. It likewise appears that a bank account in the Detroit Savings Bank showing a balance at the time of her death of $1,923.91 stood in her name. Margaret Merritt McNamara had been married twice prior to her marriage to plaintiff, but bore no children to either of her three husbands. She left several brothers and sisters her surviving, two of whom, Arthur Webber and Minnie B. O'Sullivan, on June 14, 1915, quitclaimed to plaintiff all of their interest in the real estate left by their sister Margaret. Being unable to secure quitclaim deeds from the others, said brothers and sisters, plaintiff filed his bill of complaint herein, praying that the title to said house and lot and the money in the bank standing in the name of said Margaret McNamara be decreed to be in him. To this bill six of said defendants

interposed a demurrer. The record shows no disposition of the demurrer. There is in the record, however, an answer filed on behalf of all the defendants, and the case went to a hearing upon the merits, resulting in the entry of a decree dismissing plaintiff's bill of complaint. From this decree plaintiff appeals.

Plaintiff, who at the time of the trial was about 70 years of age, introduced testimony tending to show that during all the years he and Margaret McNamara lived together as husband and wife, he followed the occupation of a marine engineer, sailing the Great Lakes; that his occupation kept him from home 9 or 10 months of each year; and that while away from home he from time to time forwarded to his wife various sums of money from his wages. It is in evidence that Margaret McNamara upon receipt of these money orders or checks cashed them, paid the household expenses out of their avails, and deposited the balance thereof in the Detroit Savings Bank. No witness was sworn who was able to give the number or amount of the several deposits made in said bank out of the moneys represented by said checks. The bank account introduced in evidence shows that it was started in 1893, with a deposit of $527. Deposits and withdrawals continued until the end of 1910, when the balance was upwards of $4,500. In 1911 $2,400 was withdrawn from the account to pay for the house which was built upon the lot, the deed to which had been taken in the name of Margaret McNamara, on April 20, 1910.

Plaintiff's counsel states his position as follows:

"*First.* Michael McNamara was the head of his family by law.

"*Second.* That as such it was his duty to support his family, consisting of his wife, Margaret, and his three little children.

"*Third.* That the law of this State enforced this duty against him and properly so, too. It made of

him a criminal if he did not support, maintain, and provide for them.

"*Fourth.* Michael McNamara did not need this stimulation. He was an honest, upright, manly, good citizen, and natural father, and the support by him of his wife and children was a labor of love; that it was a pleasure to discharge as well as a duty, and he gladly did it.

"*Fifth.* That by the adjudged laws of this State a wife is presumptively, and as a matter of legal inference, her husband's agent in the dispatch of his necessary business in his absence. *People* v. *Horton,* 4 Mich. 67.

"*Sixth.* Michael McNamara was off on the waters of the Great Lakes 10 months out of the 12. He was not in reach of his family, daily, weekly, or monthly. He got his pay. It was his money. He had a paramount duty, to support his wife and children. He recognized it. He passed all of his money practically over to his agent, his wife, the only adult he had to take charge of it; the only person he could give it to without insulting her. He gave it to her to take care of, care for, and disburse upon his and his family's account, first, to feed them, second, to clothe them, and third and lastly to defray any incidental expenses such as might arise from sickness, accidents, or any other unfortunate emergency arising suddenly. This she did with the highest integrity and probity. The rest was his. He does not question the expenditure of his money by his wife so far as it was disbursed for the purposes indicated."

Much reliance is placed upon the following testimony given by Arthur Webber, brother of Margaret McNamara:

"*Q.* Now, tell the court in your own way, as near as you can recollect it, what it was that she said to you?

"*A.* I was in the commission business at 24-26 Western Market, and my sister Maggie came down to market one morning, and she stopped over to see me. * * * Well, now, I couldn't just give you the date, because I let it slip my mind, and didn't do what she asked me to, and, of course, when she came up there,

I shook hands with her, and said, 'You are looking fine; how do you feel?' She said, 'I am not feeling very well.' She said, 'Arthur, I don't think I will live very long; I haven't been feeling very well, and I tell you what I want you to do; I want you to fetch up somebody to make a will.' I said, 'You do?' in an off-hand way, and I said I would go up and make it myself. Well, that wouldn't do. She said, 'I want somebody to make a will.' I said, 'What are you going to do, will it to me? I need it all in my business.' And she said, 'No, I want to will it to Mike.'

"*Mr. O'Neil:* I insist that be stricken out, on the ground it hasn't any bearing on the particular question involved here.

"*The Court:* Oh, I think I will let it in. (Exception.)

"*Q.* Why did she want to will it to Mike?

"*A.* Well, she said Mike was getting old; he was very good to her; he gave her every dollar; he trusted her more than he trusted himself; he sent his money when he was on the ship, for fear the ship would sink; and he trusted it to her; and she said, 'I have got the house built in my own name, the money in my own name, the house in my own name, and if I should die I don't know what they would do to Mike.' She said, 'It wouldn't be you because I know you wouldn't want it.' I said, 'All right, I will fetch somebody,' but I was very busy, and I neglected to fetch them up.

"*Q.* Another way. How long was it before she died that she had this talk?

"*A.* Well, this was, oh, I don't know.

"*Q.* A month or a year?

"*A.* Oh, it was more than a month; I couldn't just tell exactly.

"*Q.* About?

"*A.* Oh, well, probably three months.

"*Q.* It was inside of a year?

"*A.* Oh, yes."

Giving the strongest probative force to this testimony as well as all other testimony in the record offered on behalf of the plaintiff, we are of opinion that it fails to establish the claim of plaintiff that in acquir-

ing the real estate and creating the bank account, Margaret McNamara acted as the agent of her husband, indeed, it would rather tend to support the conclusion that she claimed all of such property as her own, but desired by the execution of a will to place title thereto in her husband at her death. This she failed to do, and her unexecuted intention in that regard cannot aid the plaintiff. With reference to the real estate, we are at once met with the statute (4 How. Stat. [2d Ed.], § 10675, 3 Comp. Laws 1915, § 11571), which provides:

"When a grant for a valuable consideration shall be made to one person, and the consideration therefor shall be paid by another, no use or trust shall result in favor of the person by whom such payment shall be made; but the title shall vest in the person named as the alienee in such conveyance, subject only to the provisions of the next section."

Section 10677 (3 Comp. Laws 1915, § 11573) reads as follows:

"The preceding seventh section shall not extend to cases where the alienee named in the conveyance shall have taken the same as an absolute conveyance in his own name, without the knowledge or consent of the person paying the consideration, or when such alienee, in violation of some trust, shall have purchased the lands so conveyed, with moneys belonging to another person."

The record is absolutely barren of evidence tending to show that Margaret McNamara took title to the lot in question without the knowledge and consent of her husband, the plaintiff. It is likewise barren of evidence showing conclusively that the consideration was paid by the plaintiff. In the case of *Waterman* v. *Seeley*, 28 Mich. 77, it is said:

"In order to maintain such a trust, there must have been an intention to create it, and there must have

been an actual payment of the consideration, made out beyond any doubt to have been the individual money of the party seeking to raise the trust. Proof of such payment will usually, as between strangers, raise a presumption in favor of such an intention, but even then, the trust raised by parol may be rebutted by parol. * * * No such presumption arises where the title is taken in the name of a wife or child, and the principle covers cases where, without legal relationship, the person paying the purchase money stands, or assumes to stand, *in loco parentis* to the grantee. The presumption there is both natural and legal. that in paying for land to be granted to the child so situated, it is intended as a donation or advancement, and not as a trust in favor of the donor."

Again in the late case of *Rothschild* v. *Dickinson,* 169 Mich. 200 (134 N. W. 1035), this court said:

"We do not think that oral testimony can be resorted to, to create a trust in real estate"—citing cases.

Touching the bank account, we are met with another difficulty. Evidence introduced tends to show that prior to her marriage to the plaintiff, Margaret McNamara had been engaged in business on her own account. Exactly what property she had at the time of her marriage is not shown by the evidence, but plaintiff's bill asserts that at the time of the marriage—

"she had no money or property, real or personal, except a small bank account in the Detroit Savings Bank, where she innocently deposited all her money which she became in possession of, both her own and complainant's."

Assuming, then, what the evidence in the record tends to establish that some portion of the bank account is represented by deposits made out of the funds sent to Margaret by her husband, the plaintiff, and assuming, further (which we do not hold, see *Wipfler* v. *Detroit Pattern Works,* 140 Mich. 677 [104 N. W.

545, 112 Am. St. Rep. 430]), that as to such portion, Margaret should be considered as the agent of the plaintiff instead of as the absolute donee of the fund, how may the court determine what proportion of said bank account properly belongs to the estate of Margaret McNamara, and what proportion thereof to the plaintiff? It is obvious that upon this point no conclusion can be reached based upon the testimony in the record, and the court would be obliged to resort to mere conjecture. This we may not do.

The decree must be affirmed.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, STEERE, and FELLOWS, JJ., concurred.