FLEMING v. DALTON.

1. BANKS AND BANKING — JOINT DEPOSITS — OWNERSHIP — GIFTS INTER VIVOS.

In an action by a father against a daughter for the amount of a deposit in a bank placed there by plaintiff's wife in the joint names of herself and defendant, and withdrawn by the latter after her mother's death, the burden of proof is upon plaintiff to establish his ownership of the money, which he claimed to have entrusted to his wife to handle for him.

2. MARRIED WOMEN—BUILDING AND LOAN STOCK—OWNERSHIP OF FUND ACCUMULATED—STATUTES.

Section 10001, 2 Comp. Laws 1915, providing that married women may become subscribers to the capital stock of building and loan corporations, and hold, control, and transfer their stock in all respects as *femmes sole*, and that their stock shall not be subject to the control of or liable for the debts of their husbands, construed, and *held*, to protect married women in the ownership of the fund derived from and accumulated through the ownership of such stock.

3. HUSBAND AND WIFE—MARITAL DUTIES—ADULT CHILDREN.

There is no legal obligation upon a wife imposed upon her by her marital duties to her husband in caring for, managing, and doing the housework of their home, to assume the extra burden of taking their adult children as boarders.

4. BANKS AND BANKING—JOINT DEPOSITS—OWNERSHIP—EVIDENCE.

Evidence examined, and *held*, insufficient to sustain the finding of the jury that plaintiff was the owner of the fund.

Error to Jackson; Parkinson, J. Submitted October 15, 1917. (Docket No. 118.) Decided June 3, 1918. Rehearing denied July 18, 1918.

Assumpsit by James Fleming against Mary E. Dalton for money had and received. Judgment for plaintiff. Defendant brings error. Reversed.

*Thomas M. Poynton* and *James J. Noon,* for appellant.

*Reece, Blackman & McGraw,* for appellee.

STEERE, J. Mary Fleming died at Jackson, Michigan, on March 16, 1916, survived by her husband, James Fleming, plaintiff herein, their daughter Mary E. Dalton, defendant herein, and three sons named James, Peter, and John Fleming. Her age is not stated but she was an elderly woman, her husband James being 70 years old at the time of the trial, her daughter Mary 42, their son James 47, and John, who testified that he was the youngest of the family, told of events happening in 1902 at which time he had married and left the parental home. About 8 years prior to her death Mary Fleming caused a savings account for deposits by her in the Jackson City Bank to be made payable to herself and defendant. Pass-book No. 402 of the savings department of said bank, which she delivered to defendant before her death, shows the account is with "Mary Fleming or Mary Fleming-Dalton," that it was opened in 1896 by a deposit of $1 and ran through succeeding years in varying amounts until at the time of her death the credit balance was $697.35, which was thereafter withdrawn from the bank by defendant who claimed it was given to her by her mother. Claiming this money was his, and had been entrusted to deceased as his wife to handle for him in that capacity, plaintiff brought this action to recover the same from defendant. The trial resulted in a verdict and judgment for him of $731.33, being the full amount of such deposit with interest from the time it was withdrawn.

Defendant's 50 assignments of error, many of which do not impress us as demanding serious consideration, are directed to claimed erroneous admissions of testimony, refusal to charge as requested, the charge as

given, prejudicial argument of counsel, that deceased's estate is not made a party defendant and refusal of the court to grant defendant's motion for a directed verdict in her favor.

This was a savings deposit put by deceased in the joint names of herself and daughter with declaration of donation at the time followed by delivery before her death of the bank pass-book for the same. No question is, or we think can be, raised as to a gift to defendant by deceased, provided it was hers to give. Plaintiff's only claim is that it belonged to him. Upon that proposition the burden of proof rested upon him under the undisputed facts.

Plaintiff and his family came from Glasgow, Scotland, 39 years previous to the time of the trial, first to Ohio where he worked in the mines a couple of years and then moved to Jackson where they thereafter remained. Plaintiff is not shown to have had any trade or special calling, and what line of employment he followed is not disclosed except by his statement that he worked in the mines in Ohio and was at the time of the trial working for the city in the water department, repairing water service pipes and mains. His son James testified that he was a steady, hard working man without education and had "no business facilities at all." It is shown that he turned his wages over to his wife, whether in whole or in part is a matter in dispute, that she managed all their business and household affairs, making the purchases and paying the bills for the family. The record is silent as to the amount of plaintiff's average earnings, what wages he ever received or what amount he regularly or at any time turned over to his wife. She is, however, shown to have been a thrifty, economical and saving woman, who at times had savings accounts in banks and in 1898 took some stock in the Standard Savings & Loan Association of Detroit, on which she paid $5.25 per

month until July 26, 1907. From this she realized $560.84. It was not shown that she had any funds or income other than she received from her husband and children; but it was shown that the children all lived at home some time after they respectively became of age and while there paid their mother for their board, some giving her other money at times. James, who was married when 27 years of age, nearly 20 years before his mother died, testified that he lived at home up to the time he was married and "everybody had to pay their board that stayed at home." Defendant remained at home until she was 32 years old, working in a corset factory as a machine operator earning seven and eight dollars a week and "contributed money to mother in addition to paying my board," as she testified. John remained at home and paid board after he was of age. He testified that in 1902 after he was married and living elsewhere he gave his mother money to pay the building and loan association. Peter, who never married and lived at home until his mother died, was said to have "always contributed and paid his board." That plaintiff was not always at home earning wages and turning them over to his wife is made plain. James, Jr., tells of his father going away to Saginaw in 1902, where work was very slack, as in Jackson at that time, and that he stayed for a time "waiting for it to break up," which he thought there was reason for "because there was not much work there and he might have had some little rumpus with mother." Defendant and John also tell of his being absent. Defendant testified that between 1898 and 1905 he was away from home most of the time; that he left her mother in 1892 and was gone about eight months and did not contribute to her support during the period of 1902; that he left home in September, 1904, and did not return until March, that he once left and boarded with one of the neighbors for two or

three weeks and then got a room down town. These matters only serve to emphasize the uncertainty in which the evidence leaves the extent of his contributions to his wife, out of which it must be found all the savings account in question came in order to sustain this verdict. To the extent money was given her by the children it is as fairly inferable she put into this saving, as that it was entirely made up of money received from plaintiff.

It also appears that shortly before deceased placed this savings account in the name of herself and defendant she had received from the Standard Savings & Loan Association of Detroit between five and six hundred dollars in payment for the transfer or surrender of seven shares of its stock which she had held in said company and paid dues on for about seven years. From whatever source she may have obtained money to pay her dues, she had been a subscriber and held such stock as her own during that time. By section 7580, 2 Comp. Laws (2 Comp. Laws 1915, § 10001), it is provided, so far as material here, that:

"Married women may become subscribers to the capital stock of such corporation, and hold, control, and transfer their stock in all respects as *femmes sole,* and their stock shall not be subject to the control of or liable for the debts of their husbands."

Directly applying to the relation of husband and wife, this provision necessarily means something more than the right of the wife to invest her own independently acquired funds or savings in building and loan stock, for she already had that right to the full under the so-called married woman's act (3 Comp. Laws 1915, § 11485). It would scarcely be within the fair intent of this provision, or the spirit of our modern legislation emancipating the wife from oppressive common law rules respecting her marital relations, to con-

strue the law as only protecting the wife as a *femme sole* in her ownership while for herself and in her own name saving and accumulating a fund in this manner, but leave her husband and his creditors free to take it away from her after it has been thus accumulated and paid over to her by the association.

Deceased's marital duties to her husband, in caring for, managing and doing the housework of their home, imposed upon her no legal obligation to assume the extra burden of taking their adult children as boarders, even though a natural and congenial arrangement to all of them. This she did, receiving from them the pay for their board with his knowledge and consent, to which he never made claim during her lifetime.

During the last five years of her life, irrespective of any donation or permission by her husband, she was absolutely entitled to all earnings acquired as the result of her personal efforts in services performed for others than her husband. Act No. 196, Pub. Acts 1911 (3 Comp. Laws 1915, § 11478).

The record is destitute of any testimony showing plaintiff's earnings at any time, their family expenses or what amount he ever gave his wife, or what if any directions he ever gave her as to the disposition of what she received from him, or any claim made by him for any of it during her life.

It is shown that when she died, and when she put this savings account in the name of herself and defendant, deceased had property of her own, some money at least which legally and separately from her husband belonged to her. There is no evidence showing how much of it or how much of that received directly from plaintiff went to make up the deposit in dispute. The burden of proof rested upon him to show this by competent testimony, and trace directly or circumstantially the money he claimed to have entrusted to his wife as his agent through her hands

into that deposit to its full amount in order to sustain his verdict for that amount with interest.

In that respect this case is analogous in many particulars to *McNamara* v. *Langguth*, 198 Mich. 776, where it is said of deceased wife's bank account claimed by her husband:

"Assuming, then, what the evidence in the record tends to establish, that some portion of the bank account is represented by deposits made out of the funds sent to Margaret by her husband, the plaintiff, and assuming, further (which we do not hold, see *Wipfler* v. *Pattern Works*, 140 Mich. 677 [104 N. W. 545, 112 Am. St. Rep. 430]), that as to such portion, Margaret should be considered as the agent of the plaintiff instead of as the absolute donee of the fund, How may the court determine what proportion of said bank account properly belongs to the estate of Margaret McNamara, and what proportion thereof to the plaintiff? It is obvious that upon this point no conclusion can be reached based upon the testimony in the record, and the court would be obliged to resort to mere conjecture."

For the foregoing reasons the judgment is reversed, with costs to defendant, and a new trial granted.

OSTRANDER, C. J., and BIRD, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.