JOHN P. TENNISON *v.* STATE OF MISSISSIPPI.

CRIMINAL PROCEDURE. *Venue. Change of. Code* 1892, § 1411.

> Where, upon application by defendant to change the venue in a
> criminal case, under code 1892, § 1411, providing for such pro-
> cedure, it was shown by a number of witnesses that they had heard
> expressions in the county to the effect that defendant ought to be
> hung, that when he was denied bail there was applause in the
> court-house, one witness testifying that it would be almost impos-
> sible to secure a fair trial, and another that every person he had
> talked to on the subject thought an impartial trial could not be
> had, the application should be granted, although several wit-
> nesses for the state testified that they believed twelve men could
> be secured who would, as jurors, do what they thought right, and
> another believed that there were one hundred such men in the
> county.

FROM the circuit court of Lowndes county.

HON. EUGENE O. SYKES, Judge.

Tennison, appellant, was indicted for the murder of one
Morris Dreese. He moved the court for a change of venue on
the ground that he could not secure a fair and impartial trial
in the county. The facts shown on this application are suffi-
ciently stated in the opinion of the court. The application
was denied, appellant was put upon his trial, was convicted
of manslaughter, and sentenced to the penitentiary for a term
of twenty-five years, from which conviction and sentence he
appealed to the supreme court.

*Z. P. Landrum, Jr.,* and *James T. Harrison,* for appellant.

Twenty or more unimpeachable witnesses testified that, on
their belief, defendant could not have a fair and impartial trial
in the county of the homicide, and most of those testifying
contra, testified ·on cross-examination that their opinion that
defendant could get a fair and impartial trial in the county

was a general opinion, based upon their opinion of the good citizenship of Lowndes county, generally and absolutely, without reference to this case, they not pretending to know the general opinion or sentiment of the county upon this particular homicide.

As a matter of fact, over two hundred citizens were summoned from the body of the county before twelve men were gotten who would say that they were impartial, and against whom appellant knew nothing to the contrary. Talk of lynching was proved, inflammatory newspaper articles introduced, and it was abundantly shown that feeling against the defendant and talk of lynching him were especially strong in Columbus, where the trial was had. It was urged then, and is now urged, that, though you may succeed in getting a jury from the county who will say that they are impartial, and may be, in fact, at the start, yet that the case being tried in the town where the killing occurred, an almost mob of town spectators constantly in the audience, showing anger and indignation against the defendant in their countenance, smiling or laughing in scorn at evidence in his favor, showing the thunder-cloud brow when the evidence goes against him. And, added to these, the many and varied ways in which an unfriendly audience can throw its sentiment into a jury box, there was not only a reasonable doubt that defendant could have a fair and impartial trial, but it was certain that the audience would not believe anything testified to in his favor; and the audience comes very near being the jury where the case is tried in a town where the town wants to hang the prisoner, and will hang him if he is ac-quitted.

*Monroe McClurg,* attorney-general, and *Sykes & O'Neill,* for appellee.

That the appellant had a fair and impartial trial cannot be questioned upon the record. That the jury acquitted him of murder, and found him guilty of manslaughter only, demon-

strates that they were not prejudiced against him, and shows them to have been unduly merciful.

But the evidence, on the motion for change of venue, was insufficient to support the application; the circuit judge heard and carefully considered the testimony, and his judgment should not be set aside; certainly it cannot, in the light of the subsequent proceedings, be held to have been an abuse of judicial discretion. Appellant ought to congratulate himself on the result in the court below.

Argued orally by *James T. Harrison,* for appellant, and by *Monroe McClurg,* attorney-general, for appellee.

WHITFIELD, C. J., delivered the opinion of the court.

On the motion for a change of venue in this case, a large number of witnesses were examined, both on the part of the defendant and the state; and of the witnesses introduced for the defendant it is to be said that they came from nearly all the walks of life, and from every part of the county, and that their testimony, summed up, was of the strongest possible character to show that the appellant could not have had, at that term of the court, a fair and impartial trial in the county. The testimony shows substantially that public sentiment ran very high against appellant, and that this adverse sentiment was prevalent throughout the county, especially in the city of Columbus, where the killing occurred; that so intense was this feeling that lynching was threatened, and, for fear of a mob, the jailer was notified; that on a preliminary trial, where the prisoner was denied bail, there was a very large attendance, many coming from the country, and that when the judgment of the court was announced there was vociferous applause, clapping of hands, rattling of sticks, and cheering. Many expressions were testified to, to the effect that defendant ought to be hung; and some of the witnesses testified, with great reluctance, that a fair and impartial trial could not be had, as, for

instance, Mr. Flood, justice of the peace for district No. 2. It was evident that he did not wish to say a fair and impartial trial could not be had, if it could possibly be avoided, yet was driven to that conclusion by what he had heard. One witness stated that he thought it would be "almost an impossibility" for defendant to secure a fair trial, and this witness stated, when asked who he had heard express themselves: "It would be almost impossible for me to make an estimate. I have heard so much from the citizens of Columbus." Another witness stated that he heard it said that he ought to be hung without judge or jury; another one, that he had heard that, in the eyes of the public, he had already been tried, and that the public judgment was that he was guilty, and ought to be hung, and this witness stated that he had heard men, both in Columbus and the country, speak of it. Another witness made a statement, which we regard as very intelligent and significant, in response to a question of the court. He was asked by the court what he meant by saying that they could not get a fair and impartial jury to try defendant in Lowndes county, and answered: "No, sir; I do not think they could, if men regard their oaths that have expressed themselves. A man cannot be a competent juror and express himself, and that question would be asked them. Of course, I have not talked to all the men in the county, but every man I have talked to, that is his opinion." . This is substantially all the testimony on the part of the witnesses for a change of venue, and discloses the feeling in every part of the county, even showing threats of lynching, and vociferous applause of the judgment denying bail in the court-room.

When we come to consider the testimony offered by the state, we think it fair to say that the impression is left upon the impartial mind that their testimony, to the effect that a fair and impartial trial could have been secured, is of the most general character. One of the characteristics of nearly all of this evidence may be seen by reference to the cross-examina-

tion of one of the witnesses for the state. He was asked, "What do you think would be a fair and impartial trial?" He answered: "I think they could get twelve men in the county who, according to the evidence, would do what they thought right. I believe certainly that we can get twelve honest men in the county, if not fifty or one hundred. I think we can get fifty men, or one hundred men, who could do exactly what they thought was right." This misconception of the true test as to whether a defendant could, under the procedure marked out by law, obtain a fair and impartial trial in the county, is the keynote to the responses of a large portion of the witnesses for the state. We make no doubt that there are hundreds of honest men in the good county of Lowndes, peers of men anywhere in the world, who would do what they thought right; but that is not the question involved here. Another witness for the state stated that he thought a fair and impartial jury could be obtained if you were permitted to pick them out, the same misconception characterizing his view. It is obvious they did not have the true test in mind. The question here was whether, "by reason of prejudgment of the case, or grudge, or ill will to the defendant, in the public mind, he could have a fair and impartial trial in Lowndes county." The jury is not to be picked in the way the witness indicates. Nor does it follow that because there are 100 men, as the witness stated, in the county who would do exactly right, that all .twelve of the jurors, selected according to the procedure marked out by law, would come from that body of citizens. That, most manifestly, is an incorrect test, and yet this is the test set up by a large portion of the witnesses for the state. One state witness stated squarely that he did not believe that a fair trial could be had. The expression is quite common from the witnesses for the state that they "would hate to think that a fair and impartial trial could not be had in the county," and yet one of the witnesses who says this, admitted, on cross-examination, that the expression of opinion was very unfavorable to defend-

ant. Another one of the witnesses, laboring under the same misconception, stated that "if they could not get a fair trial where they were known, they could not get it in London." There would be little scope for the operation of the venue statute, if defendants could be always compelled to be tried where they are best known, and where the circumstances of the killing are thoroughly familiar to all. The object of the statute is to avoid the grudge and ill will and prejudgment that often arise from this very familiarity with all the facts. It is a great mistake to suppose that because an atrocious crime has been committed, for which one ought certainly to be convicted anywhere, therefore a change of venue should not be granted. It is one of the crowning glories of our law that, no matter how guilty one may be, no matter how atrocious his crime, nor how certain his doom, when brought to trial anywhere, he shall, nevertheless, have the same fair and impartial trial accorded to the most innocent defendant. Those safeguards, crystallized into the constitution and laws of the land as the result of the wisdom of centuries of experience, must be, by the courts, sacredly upheld, as well in case of the guiltiest as of the most innocent defendant answering at the bar of his country. And it ought to be a reflection, always potent in the public mind, that, where the crime is atrocious, condemnation is sure, when all these safeguards are accorded the defendant, and therefore the more atrocious the crime, the less need is there for any infringement of these safeguards. We are not unmindful of the announcement in Cheatham's case, 67 Miss., at p. 339 (7 So. Rep., 205); 19 Am. St. Rep., 310, that if "the trial, as surveyed from its conclusion, instead of its commencement, shows that it was entirely free from any bias against the appellant," then the motion for change of venue was properly denied. We are rather strengthened in our view, looking back over the whole trial. Each case wherein a motion for change of venue is made must be determined on its own special facts. No general rule is possible of formulation. Much of general value may

be found in *People* v. *Yoakum,* 53 Cal., 571, the court con-cluding: "The prisoner, whether guilty or not, is unquestionably entitled by the law of the land to have a fair and impartial trial. Unless this result be attained, one of the most important purposes for which government is organized and the courts of justice established will have definitely failed. Cases sometimes occur in which the very enormity of the offense itself arouses the honest indignation of the community to such a degree as to make it apparent that a dispassionate investigation of the case cannot be had. Under such circumstances, the law requires that the place of the trial be changed." We pass upon no other assignment of error. See the practice: *Howell* v. *Thompson,* 70 Cal., 636, 637 (11 Pac., 789), where an order denying change of venue was reversed; *Bennett* v. *Carey,* 57 Iowa, 221 (10 N. W., 634), and *Gilman* v. *Donovan,* 59 Iowa, 76 (12 N. W., 779), where orders granting change of venue were re-versed.

We have given this case the most earnest and painstaking consideration. We have weighed the testimony on this motion with all possible care, and we are driven to the conclusion that the learned and accomplished judge of the trial court erred in not sustaining the moton for a change of venue.

*Reversed and remanded.*