## BOND v. STATE.

[91 South. 461. In Banc. No. 22069.]

1. CRIMINAL LAW. *Supreme court in reviewing refusal of change of venue will review all the testimony.* •

   In reviewing the action of the circuit court in refusing defendant's application for a change of venue the court will review all of the testimony in the case, and will judge from it whether or not a fair and impartial trial was had.

2. JURY. *Special venire summoned as provided by statute not quashed except for fraud; special venire not quashed because sheriff who summoned veniremen was related to deceased; special venire not quashed because half of those summoned were related to deceased.*

   Where a special venire was summoned as provided by section 2715. Code 1906 (section 2208, Hemingway's Code), it will not be quashed except for fraud. Where the testimony shows that the veniremen were summoned by a deputy sheriff, the fact that the sheriff was related to the deceased is no reason to quash the venire. Neither will the venire be quashed because about half of those summoned were related to the deceased.

3. CRIMINAL LAW. *Where two officers were killed during same shooting affray, testimony as to killing of one was admissible in prosecution for murder of the other.*

   Where the testimony shows that shortly before the killing two men jointly indicted agreed that if one of the deceased and any revenue officers attempted to arrest them they would either kill them· or be killed, and that when the revenue officers appeared upon the scene the shooting immediately began, participated in by five men, and lasting but a short while, and where both officers were killed, in the trial of a defendant charged with the killing of the first officer shot down, evidence of the shooting of both men is admissible, as is also testimony of the nature, description, and character of the wounds sustained by the officers who was last killed. The entire affray constituted but one transaction, · in which the unlawful agreement to kill both officers was carried out.

   ETHRIDGE AND ANDERSON, JJ., dissenting.

APPEAL from circuit court of Greene county.

HON. J. D. FATHEREE, Judge.

Henry A. Bond was convicted of murder, and he appeals. Affirmed.

*A. E. Anderson* and *Cephus Anderson,* for appellant.

*H. C. Holden,* Assistant Attorney-General, for the state.

No brief found in the record for either side.

SYKES, J., delivered the opinion of the court.

The appellant, Henry A. Bond, Mancey Kelly, John Adams, and Will Morris were jointly indicted for the murder of J. F. Green. By the same grand jury these defendants were also jointly indicted for the killing of Lawrence Dunham. The defendants all joined in a motion for a change of venue from Greene county. This motion was finally overruled, and Mancey F. Kelly was tried and convicted of the murder of Lawrence Dunham, and sentenced to be hanged. An appeal was prosecuted to this court and the judgment of the lower court was affirmed. 90 So. 490. On that appeal the motion for a change of venue which was made by all the defendants was presented to the court, and after a most careful consideration the judgment of the lower court was affirmed.

Immediately after the trial of Kelly for the killing of Dunham this appellant was put on trial for the killing of Green, and in this trial the motion for change of venue was renewed. By agreement of counsel on both sides the testimony introduced upon the first motion was considered as a part of the testimony upon this motion for a change of venue. In addition thereto the appellant, Bond, made affidavit that, for reason of prejudice and ill will, he could not get a fair and impartial trial in Greene county. And a supporting affidavit to the same effect was filed by two other persons. Another motion was also filed for a change

of venue by the appellant, in which he alleged further that the men who were killed were members of large and prominent families, and that a number of the veniremen summoned to try Kelly were related by blood or marriage to Dunham and Green; that the sheriff of Greene county, Webb Walley, is a relative of the deceased Dunham, and that, because the jury boxes were exhausted, the court ordered the sheriff upon an open venire to summon eighty men; that the members of this special venire were within the hearing of the courtroom, and heard parts of the argument of counsel in the Mancey Kelly case, and that Kelly was convicted of murder and sentenced to be hanged; that during the argument of the Kelly case in the courthouse and courtyard were numerous relatives of the two dead men, and that for these additional reasons the appellant's case was prejudiced in the public mind, and he could not get a fair and impartial trial. The record shows that when the appellant asked for a special venire the jury boxes were practically exhausted, and that the court ordered a special venire issued by the clerk directed to the sheriff to summon eighty jurors, as is provided by section 2715, Code of 1906 (section 2208, Hemingway's Code); that the sheriff himself did not personally summon this venire, but it was done by a deputy. A motion to quash this special venire was made by the defendant. He alleges in this motion that the sheriff, Webb Walley, is kin to the deceased Dunham; that the venire was returnable the day that the Kelly case was argued before the jury, and that the veniremen who were out in the courthouse yard heard parts of the argument of the Kelly case; that there were relatives and friends of the two dead men in the courtyard at the time, and that these relatives and friends were mixing and mingling with the veniremen; that the special venire was not selected from the county generally, but from certain special sections of it; and that a large number of them were related to the two dead men. Additional testimony upon the motion for a change of venue was introduced by both

sides, which testimony was also considered on the motion to quash the venire.

The chancery clerk testified that he was serving his second term in that office, and had been tax assessor for twelve years; that there are one thousand, two hundred or one thousand, four hundred voters in Greene county, and that in his judgment, Bond could get a fair and impartial trial in the county, considering the county as a whole, and the method in which jurors are drawn; that the people at large had not heard the facts connected with the case, and did not know enough about it to disqualify them; that the special venire drawn in this case had been excluded from the courtroom during the trial of the Kelly case, and had not heard any of the testimony. He testified that there had been a big crowd present during the trial of the Kelly case, but numbers of the citizens of the county had not been there.

The circuit clerk testified that the defendants had a number of relatives in the county; that he believed Bond could get a fair and impartial trial; that he based this opinion upon the public sentiment; knowing the people as he did, that de did not think the majority of the people knew before the meeting of court what men had been arrested for this killing; that as circuit clerk he saw and talked to a great many men in the county; that he had heard no expressions of ill will or prejudgment of Bond's case except by some of the relatives of the dead men, but that the general run of citizens had not done so; that the two dead men had a number of relatives in the county. The circuit clerk also testified about issuing the open venire in this case to be executed by the sheriff as above set out.

Several other witnesses were introduced by the state who testified that there had been no prejudgment of this case, and that they believed the defendant could get a fair and impartial trial. The sheriff also testified that his deputy summoned the venire in the Bond case; that he had nothing to do with it personally, except that he told the deputy to get good men; that he was related to the deceased Dun-

ham. He also testified that a large crowd attended the trial of Kelly.

The defendant introduced several witnesses who were summoned on the venire to try Bond. A number of these were kin to either the deceased Dunham or Green. Some of them testified that they were in the courthouse yard during the argument of the Kelly case, and could occasionally hear a part of the argument. Some of these had heard the case discussed, but a number of them testified that they had not heard anybody say that his mind was made up as to the guilt or innocence of Bond. None of these witnesses heard all of the argument of any lawyer, and none of them testified that he formed an opinion as to the guilt or innocence of Bond from these arguments. Some of these witnesses had formed and expressed an opinion as to the guilt or innocence of the defendant.

Without going into detail into all of this testimony, it is sufficient to say that the vast majority of witnesses who testified stated that there was no ill will against the defendant, and had been no prejudgment of his case; that they believed he could get a fair and impartial trial in Greene county.

In the impaneling of the jury it developed that nearly half of the eighty men were related by blood or marriage to either Green or Dunham, and about four of them were related to either Bond or Kelly. The venire of eighty men was exhausted, and the two regular juries were called and exhausted; then twenty additional veniremen were summoned, and the jury was completed from them. The ratio of relationship to the two dead men continued in about the same proportion as it did in the examination of the special venire. Not one of the jurors who tried Bond was challenged for cause by the defense. The record shows that every one of them was a fair and impartial juror; that not one of them had formed or expressed an opinion as to the guilt or innocence of Bond; that they had no bias or ill will against him; that, while some of them might have heard some scattering echoes of the argument

· of counsel in the Kelly case, it had made no impression upon them.

The record further shows that some of the veniremen had heard that the jury had found Kelly guilty of murder, and we presume that this fact was known to some, if not all, of the jury who tried Bond. In qualifying the veniremen counsel for the defense requested the court to ask each of them if it would have any effect upon his deliberations if the testimony developed the fact that the defendant and his associates were at a whisky still, and the two men killed were prohibition officers. The court declined to ask this question, but asked them generally and fully about the presumption of innocence and the law of self-defense.

This tragedy occurred in the northwest corner of Greene county, close to the Perry county line, and about five or six miles from Richton, which is in Perry county. The scene of it was in a swamp densely grown up with bushes and trees. The defendant, Henry Bond, and three other men jointly indicted with him were operating a whisky still in this swamp, and had been operating it for about six weeks. On the morning of the killing these four men went to the still together. Henry Bond was armed with a double-barrel shotgun, Mancey Kelley with an automatic shotgun, John Adams with a pistol, while Will Morris had no weapon, as shown by the testimony. When they got to the still they proceeded to put it together and make some whisky, some of which they drank before the shooting. The testimony shows that during all of this time Adams had his pistol in his pocket, while Bond and Kelly either had their shotguns in their hands or always within easy reach.

According to the testimony of John Adams, a state witness, a short time before the killing Kelly and Bond were off a little distance from the still talking when Adams joined them. Bond then said:

" 'Sid Baggett has acted so dirty with us I wouldn't be surprised if he ain't dirty enough to send Jake Green in here on us to catch us. But the way I feel now I don't

know whether I would go out with him or not, and unless ·
they kill me when they come in here. I will sure kill some-
body.' And Mancey Kelly said, 'I am with you;' and he
said, 'What about you, John?' and I said, 'Well, I don't·
know; I couldn't say for myself;' and Mr. Bond got up and
said, 'He is too chicken-hearted; I don't believe he would
kill anybody any way you could fix it. I don't believe he
has got a gun anyway.' "

Shortly after this Adams testified that while he was
stooping down to pick up a cup he heard some one hollow,
"Hands up;" that he threw his hands up, and he and Mr.
Kelly jumped up, and he (Kelly) started shooting; he
thinks Dunham shot next; that Dunham and Kelly were
shooting at each other; about this time he saw the de-
ceased Green shoot down the defendant, Bond; both Green
and Dunham were using pistols; that Adams began to
shoot at Green when Green shot Bond; Bond and Adams
were close together; that at the time Green shot Bond,
Bond was raising his gun; that before the shooting began
Mr. Bond was stooping down drinking some whisky; that
after Green shot Bond he turned and began shooting at
Adams, and Adams was shooting at Green; that while
Green was shooting at him (Adams) Bond shot Green;
a part of Green's head was shot off, his thumb was struck,
some of the shot entered his face, and one or two of the
shot hit his pistol; evidently he was instantly killed, the
defendant Bond had already been shot by Green, the bullet
penetrating his lung and practically going through him.
This witness testified that when he saw Green fall he ran;
that he did not know what Bond did after that; that when
he wheeled to run he heard some more shooting; that he
left Bond and Kelly there; that he ran off about thirty
or forty steps, and got tangled up in some briars, when he
heard somebody coming, and about that time he heard
three or four shots fired one after the other, and he heard
somebody say, "Don't shoot me; you have killed this man,"
after which he heard the four shots, and then Mr. Bond
joined him; that he asked Bond what they did, and who

got killed, and how many there were, to which Bond replied that he had killed one that he took to be Jake Green, and that he shot Lawrence Dunham, and left Mancey Kelly to finish him up, which he did. The testimony shows that Bond was very seriously wounded, and it was thought for a time that he might die.

Mancey Kelly testified that neither Green or Dunham called, "Hands up," but that they began to shoot; he does not know whether Green or Dunham fired the first shot; that Bond had just finished drinking water, and was shutting up the drinking cup when he was shot down; he did not see Green when Bond shot him; that he (Kelly) was lying on the ground, and took no part whatever in the shooting. Witness also saw Bond shoot down Dunham. He then testified that John Adams picked up his (Kelly's) gun, and went over and shot Dunham in the back four times; that while Adams was doing this shooting he (Kelly) was getting up from the ground. Kelly was shot in the arm, and a part of his gun stock was shot off. According to Kelly, after Adams had shot Dunham in the back he got his gun from Adams, and he, Bond, and Adams left the scene of the killing at about the same time.

Bond's testimony was substantially the same about the shooting as that of Kelly, except he testified that when he shot Green down Green was shooting at him, and that he shot to save his life; that immediately after shooting Green Dunham said to him, "You have killed that man, and I am going to kill you," and started toward him, and he cocked the other barred of his gun and shot Dunham; Dunham was shot in the arm and breast; this, however, was not the fatal shot; however, Dunham fell when he was shot; that after he shot Dunham he started to reload his gun, and about that time he heard shooting, and looked there, and Adams was shooting Dunham with Kelly's gun.

The deceased J. F. Green was a federal prohibition officer. The morning of the tragedy he and Dunham, who was the marshal of the town of Richton, were driven in an automobile to within about a mile of the scene of the

shooting. They left the automobile there, with instructions to the driver to wait for them. The driver heard the shooting, and waited about a half hour for the return of the men. He then went to a nearby telephone and called up some one in the town of Richton, and asked that they send out some men to help find Dunham and Green. These men then proceeded to the scene of the shooting, and found the dead bodies of the two men.

Over the objection of the defendant a physician who was in the crowd testified about the gunshot wounds in the back of Dunham. Other witnesses, over the objection of the defendant, also testified about these wounds.

The sheriff of Greene county and another witness testified to statements made to them by Bond about the shooting. The statement was made to the sheriff while Bond was in the hospital; the other statement was made while Bond was in jail. It is the contention of the defendant that these statements were inadmissible because they were not freely and voluntarily made. According to these witnesses, however, there were no threats, no duress, no hope of reward, held out to Bond, but his statements were free and voluntary. He knew that Walley was the sheriff when his statement was made, and it was not necessary for either of these witnesses to tell him that the statements might be used against him at his trial.

Two special bills of exceptions were taken to certain portions of the argument of Attorney E. C. Fischel, one of counsel for the state, and also to the argument of the district attorney. That part of Mr. Fischel's argument objected to is as follows:

"I congratulate the people of Greene county for not having mobbed the defendant, as shown by the trial of Mancey F. Kelly that this dastardly and devilish deed of shooting Lawrence Dunham in the back was a test. . . . Self-defense is shooting men in the back. We do not pick out Henry Bond, but the whole crowd. Lawrence Dunham was shot four times in the back with Mancey Kelly's gun, and, then, after Mancey Kelly had emptied his gun into

the back of Lawrence Dunham, and then have the nerve to ask for mercy like another man would ask another for a chew of tobacco!  .  .  .  This is the gun that Kelly used, and that man has been tried for his life, convicted, and sentenced to hang.  This is the place placed upon my arm by Mancey Kelly as the place the bullet entered his arm. .  .  .  (District attorney helps show the spots placed upon arm of Fischel.)  Mancey was coming up when Dunham beat him to it."

The district attorney's argument objected to is as follows:

"When Mancey Kelly was pouring the hot lead into the back of Lawrence Dunham,  .  .  .  but he was shooting a helpless man in the back, and there lay the body of Lawrence Dunham.  .  .  .  Where was Mancey, and what kind of a man is Henry Bond, and the only question before this jury is, Shall Bond live or shall he die?  .  .  . When the day comes for Henry Bond to be executed, and the black cap is pulled over his eyes, and he shall look upon the face of Webb Walley as the last man, and the sheriff of this county,  .  .  .  when you jury do that you break up insults on the little children of this county. .  .  .  This is the gun that Mancey Kelly committed his murder with.  .  .  .  Mancey Kelly has been marked as a murderer.  .  .  .  Penitentiary is about as uncertain as justice has been in the past."

The jury found the defendant guilty as charged, and he was sentenced by the court to be hanged.

OPINION.

There is very little difference in the testimony here presented for a change of venue and that presented in the Kelly case.  This difference is merely that the special venire of eighty men were out in the courthouse yard, and some of them heard fragmentary portions of the argument of counsel.  And also the further fact that some, if not all, of them knew that the jury in the Kelly case found him guilty as charged, and that practically half of this special venire were related by blood or marriage to the

two men who were killed. The testimony further shows that there had been no prejudgment of the Bond case; that no ill will existed against him, and that the vast majority of the witnesses thought he could get a fair and impartial trial in the county. The killing occurred in the northwest part of the county. .

While we thoroughly agree with the statement in the case of *Tennison* v. *State,* 79 Miss. 708, 31 So. 421, that:

"It is one of the crowning glories of our law that no matter how guilty one may be, no matter how atrocious his crime, nor how certain his doom, when brought to trial anywhere he shall, nevertheless, have the same fair and impartial trial accorded to the most innocent defendant" —yet in this case we are impressed with the fact that the overwhelming weight of the testimony showed that this defendant could get a fair and impartial trial in Greene county; and the examination of the twelve men who actually sat upon the jury showed that they were fair and impartial men, and had no prejudice or ill will against the defendant; neither had they formed or expressed any opinion as to his guilt or innocence. In fact not one of these jurors was challenged for cause by the defendant. The court was exceedingly careful to excuse peremptorily all veniremen who were in any wise related to either of the deceased or any of those indicted, and to excuse all who had formed any sort of opinion as to the guilt or innocence of any of these men. While a number of the veniremen were related to the deceased, yet none of them sat upon the jury, and there is no intimation whatever in the record that any of the jurors were in any wise influenced by this relationship.

Applying the rule announced in *Cheatham's case,* in 67 Miss. at page 339, 7 So. 205, 19 Am. St. Rep. 310, that if "the trial as surveyed from its conclusion instead of its commencement," shows that it was "entirely free from any bias against appellant" the motion for a change of venue was properly overruled. In this case, viewing the trial from its conclusion, we are satisfied from the record that

it was entirely free from any bias against the defendant, and that the court was right in overruling the motion for a change of venue.

Section 2716, Code of 1906 (section 2209, Hemingway's Code), provides that:

"A challenge to the array shall not be sustained, except for fraud, nor shall any *venire facias,* except a special *venire facias* in a criminal case, be quashed for any cause whatever."

The testimony in this case shows that the special venire was drawn in accordance with section 2715, Code of 1906 (section 2208, Hemingway's Code). It is the contention of the appellant that the motion to quash should be sustained because the sheriff was related to one of the deceased men, and that, because a great number of the veniremen were also likewise related, this in effect amounts to a fraud in law. However, the sheriff himself did not summon the members of this venire, but authorized his deputy, who was not kin to any of these parties, as far as the record shows, to summon it. Fraud will not be presumed, but must be proved. In this case it cannot be presumed that the deputy sheriff did other than his duty in summoning this venire. *Campbell* v. *State,* 17 So. 441; *Cook* v. *State,* 90 Miss. 137, 43 So. 618; *McVey* v. *State,* 117 Miss. 243, 78 So. 150.

It was not error to admit the testimony relating to the shooting of Dunham by Bond after Green had been shot, and the testimony of the shooting of Dunham in the back by Kelly, and a description of these gunshot wounds in Dunham's back.

According to Adams' testimony, which was not contradicted by either Kelly or Bond, a short time before the shooting Bond and Kelly agreed that, if Jake Green and other revenue officers attempted to arrest them, they would either kill the officers or get killed. In other words, that they would resist arrest even unto death. The uncontradicted testimony shows that these men were engaged in the unlawful manufacture and sale of whisky; that three

of these men, when they went to the still that morning,
were armed to the teeth, two with shotguns, and one with
a pistol. The testimony is conflicting as to whether or not
the revenue officers called upon them to hold up their
hands. Adams testified that they did; Bond and Kelly
contradict this testimony. The testimony of Adams is
that, immediately upon the command to hold up their
hands, Bond and Kelly resisted by throwing their guns
into a shooting position, and that he likewise did so. The
testimony is conflicting as to whether the officers fired the
first shot or whether Kelly did. Upon the other hand,
Bond and Kelly testified that the officers without any
warning whatever began shooting at them before they had
made any effort whatever to raise their guns or to shoot.

All of the testimony in the case shows that the entire
shooting occupied a very short period of time. It seems
that all parties were shooting just as fast as they could.
There was a short interval between the shooting down of
Dunham and his being shot in the back. Adams testified
that he had run from the scene when the last shots were
fired into Dunham's back; that immediately thereafter
Bond told him that Kelly did the shooting, because he left
him there to finish the job.

In short, this testimony shows a conspiracy or unlawful
agreement between Kelly and Bond to kill Green and any
other officers who attempted to arrest them at the still,
and that when these officers attempted so to do, they carried
out this agreement by killing them; that the killing of
both of them occurred within a very few minutes, or prac-
tically just as fast as all parties could shoot. It was but
the execution of the agreement, and constituted but one
entire transaction. Bond himself testifies that he was
present, and saw Adams shoot Dunham in the back with
Kelly's automatic shotgun. Kelly testifies that he was
present and saw the same thing.

All of the testimony shows that Morris had left the still
before the shooting occurred, and was not a participant in
it.

The killing was but one entire transaction, though two men were killed, one·a short while before the other. That which followed the killing of Green was a part of the transaction to be considered by the jury in determining the guilt of Bond, and whether or not he committed murder. The case is very much like that of *People* v. *Marble,* 38 Mich. 117, and authorities in 1 Wharton's Criminal Evidence, pp. 122-126. In fact the killing of both men was but the execution of the agreement entered into between Bond and Kelly, and all of the facts relating to the execution of this conspiracy were admissible. *Grogan* v. *State,* 63 Miss. 147; *Dean* v. *State,* 85 Miss. 40, 37 So. 501.

The special bills of exceptions to certain remarks of Mr. Fischel, of counsel for the state, and of the district attorney only purport to set out disconnected and fragmentary parts of these arguments. While some parts of them may have been improper, we do not think the jury could possibly have been swerved from rendering a verdict upon the law and the testimony. They knew, of course, that none of the defendants had been mobbed. There was nothing said in this argument about any attempt to mob them, but they were merely congratulated upon the fact that the people of Greene county had not done so. They also knew that Mancey Kelley had been convicted of the murder of Lawrence Dunham, and sentenced to be hanged. They knew these facts when they stated that they could try the defendant fairly and impartially. We are therefore satisfied that there was nothing in either of these arguments to swerve the jury from the path of rendering a verdict upon the law and the testimony.

Under the testimony the jury were amply warranted in returning a verdict of guilty as charged.

The defendant also complains that a manslaughter instruction should have been given. In the record, however, we find that the only instruction upon manslaughter was a definition of manslaughter requested by the defendant, which was given. There are numerous other assignments

of error which have been carefully considered by the court, none of which constitutes reversible error.

The judgment of the lower court is affirmed.

*Affirmed, and June 9th,* 1922, *set as date of execution.*

ETHRIDGE, J. (dissenting).

The facts of the case are as fairly and fully stated as they can be in the compass of a judicial opinion. Nevertheless the record is voluminous, and there are many subordinate and collateral facts which throw light on the facts stated in the opinion, some of which will be referred to in the course of this opinion.

I cannot agree that on this record the defendant had a fair trial. As I understand it a fair trial means a trial before an impartial judge, an honest and unbiased jury, by competent evidence, in an atmosphere of judicial calm. *State* v. *Gossett* (S. C.), 108 S. E. 290, 16 A. L. R. 1299. About the only element of this fair trial which was accorded the defendant was the element of having an impartial judge.

The motion for a change of venue should have been sustained. The appellant and four other parties were jointly indicted in two separate indictments for the killing of two men. The person with whose murder appellant is charged was largely related in the county, and had been sheriff of the county, and was widely known and much loved by the citizens of the county. Kelly, one of the parties charged jointly with the defendant with the killing of Green, and also with the killing of Dunham, had been tried for the killing of Dunham, convicted, and sentenced to be hung at the same term of court at which appellant was tried. The venire in the Kelly case and the Morris and Bond cases were drawn the same day. The jury box was exhausted in drawing the Kelly and Morris venires, and when the venire was to be drawn for the appellant, the jury boxes being exhausted, an open venire was issued to the sheriff to summon eighty veniremen for the trial of

Bond. This venire was returnable on the day that the argument in the Kelly case was had, the trial of Kelly running through several days, and not being concluded as early as anticipated. The veniremen were excluded from the courtroom, but were around the courtyard and courthouse building in hearing of the argument, which argument lasted practically all day, and was participated in by a number of lawyers justly distinguished for their legal and forensic ability. The veniremen summoned to try Bond all were within hearing of this argument, and heard much of it, although at times in the argument it could not be thoroughly understood. The sheriff was related to one of the persons killed, and the venire was actually summoned by his office deputy, who testified that the only direction he had from the sheriff was to get good men. His understanding of what was meant by good men is, of course, a matter which the record cannot reflect fully; but when the venire was returned in court it was found from an examination of the veniremen so selected that thirty-six of them were related to the deceased, Green, and four of them related to the codefendants. A large number were over age, or had legal excuses, some of them being physicians, some druggists. Of the regular juries for the week one jury of twelve men had nine of its members related to Green, the deceased; the other had seven out of twelve related to Green. Of the one hundred and four veniremen which it took to complete a jury, seventy-five were related or disqualified, leaving only twenty-nine from which a jury was to be selected, and twelve of these were peremptorily challenged by the defendant, who also wanted to challenge more, but the court refused to permit him to do so. Some were challenged by the state. It is true that the twelve men who sat upon the jury were not challenged for cause. On the record they could not be so challenged because they qualified. This, however, does not indicate that they were satisfactory to the defendant, because he exhausted his challenges and requested more with the evident intent of using them. The defendant

was not brought to the court until at the term at which he was tried. The sheriff had been active in working up the case against the defendants. He secured a confession from Bond, and, on cross-examination as to whether he warned Bond that the statement would be used against him, testified that Bond knew he was working up the case, and that itself was a sufficient warning. The chancery clerk on the motion for a change of venue testified that it was a custom in the county for large crowds to attend murder trials, and that a large concourse of people attended the Kelly trial. So the motion for a change of venue in the present case is widely different from that in the Kelly case. The defendant was entitled, on the evidence introduced in the record, which shows the above facts, and that the fact of the killing had been widely discussed in the county, to change of venue.

I think the authorities in this state demand a change of venue under the circumstances of the present case. See *Safford* v. *State,* 76 Miss. 258, 24 So. 314; *Tennison* v. *State,* 79 Miss. 708, 31 So. 421; *Brown* v. *State,* 83 Miss. 645, 36 So. 73; *Anderson* v. *State,* 92 Miss. 656, 46 So. 65.

The defendant also moved the court to quash the venire summoned by the sheriff for his trial on the ground that the venire had heard the argument in the Kelly case, and also because of the large number related to the deceased and the large number who disqualified, and renewed his motion for a change of venue. In my opinion the motion should have been sustained. The sheriff may be, and doubtless is, a good man, but, being related to one of the parties killed, and having been active in working up the evidence, manifestly he was not impartial. In addition to this the venire was permitted to remain within hearing of the argument in the Kelly case for the killing of Dunham, which involved principally the same facts as the facts in the present case. In other words, all of the facts in the present case were developed in the Kelly case, and the jury, having mingled with the relatives and friends of the deceased, and heard the facts or the principal part of

them discussed in the argument, should not have been retained to try this case. It is true the statute says that a venire shall not be quashed except for fraud, but fraud may be proven by circumstances, and the circumstance of half of the veniremen summoned by the sheriff being relatives of the deceased, and many others known to have legal excuses, coupled with the fact that the sheriff permitted them to remain within hearing of the other case, and become imbued with the ideas and sentiments of the crowd who had been attending the trial, is sufficient evidence of fraud to warrant the quashing of the venire. The Constitution furthermore provides that the defendant shall have a fair and impartial jury, and no statute can be given a construction which conflicts with the constitutional purpose of a fair and impartial trial. Furthermore, I think the case should be reversed because of the admission of the evidence against the appellant of the acts of Kelly in shooting Dunham in the back after Dunham was down, subsequent to the killing of Green, and also admitting over objection evidence of the location ·and character of the wounds on Dunham's body. The testimony shows beyond doubt, and without dispute, that Green was killed instantly, and that he was killed prior to the shooting of Dunham. If he was on trial for the killing of Dunham this evidence would be competent because of the so-called conspiracy, and because of the joint acts of the several persons indicted at the time of the killing. But certainly the facts accruing subsequent to the killing of Green, and involving the killing of Dunham, a separate offense for which the parties were indicted, would not warrant the court in admitting these facts. The killing of Green was a finished affair; the crime was complete, and the defendant's connection with it was the subject-matter of inquiry in the present case, and on all of the testimony Bond did the killing. The sole question was whether the killing was murder, manslaughter, or justifiable homicide. The act of Kelly in shooting Dunham in the back subsequent to the death of Green was wholly foreign to the issue, and

should have been excluded.  It was very prejudicial, and
the purpose of getting this evidence before the jury was
manifestly for the purpose of exacting the extreme pen-
alty on Bond for the killing of Green, and it was used, as
will be shown later in reference to the argument, effective-
ly for that purpose.  The act of Kelly in killing Dunham
was not done in the progress of the conspiracy to kill
Green.  While the acts and declarations of a coconspirator
is admissible in evidence up to the consummation of the
crime, it is not admissible thereafter.  It is certainly im-
proper to try a man for two separate killings in the same
trial unless they occur prior to the one for which the de-
fendant is being tried, and in the progress of events lead-
ing up to the killing.  The general rule is that men are
tried for each crime separately.  They are tried for the
specific crime for which they are charged, and not for
their general evil character or disposition.  The Missis-
sippi supreme court in *King* v. *State*, 66 Miss. at page 507,
6 So. 189, on this subject, says:

"Where there are several offenses, for  either  one  of
which the accused may be convicted under the indictment,
the prosecution should elect the offense which it will pur-
sue, and the testimony should be confined to that offense,
unless the case is within some of the exceptions, which
render the proof of other distinct offenses admissible.  Af-
ter one offense is proved, the prosecution should not have
liberty of the wind, to blow where it listeth.  The authori-
ties are not harmonious as to when the prosecution will
be required to make election in such case, or as to how long
a prosecuting officer will be permitted 'to fish with his wit-
nesses for evidence' before selecting the offense for which
he will ask conviction; *but it is believed that justice is
best promoted by allowing the testimony for the prosecu-
tion to go far enough to identify and show one distinct of-
fense, and when this is done, to restrict the evidence to that
offense.*" (Italics mine.)

It is certainly unfair to try a defendant for two murders
at the same time.  The killings are clearly separate of-

fenses, and on the state's evidence the defendant might properly have been convicted. But in the present case the defendant had a defense if the jury believed his version of the killing. According to his evidence the officers appeared on the scene and opened fire upon them without a word of warning, and defendant was shot through the body by Green prior to firing a shot or doing any other act, and without having any opportunity to know that his arrest was being sought. According to his evidence the revenue officers opened fire without warning, and numerous shots were fired before he reached his gun. In this evidence he is supported by numerous witnesses living in the neighborhood who heard the shooting, and testified that from eight to twelve pistol shots were fired before the gun shots were fired, and that they could tell the difference between the pistol shots and the gun shots. The fact was that Green's pistol had been fired five times, and had one loaded shell left at the time he was killed. He was killed instantly, so manifestly he fired five shots before Bond fired upon him, for Bond used a shotgun, and the whole top of Green's head was blown away when he was shot with this weapon. The facts also show that Dunham's pistol had been fired six times, and was absolutely empty. Adams, the accomplice, who testified for the state, also had fired three shots before this killing occurred. So there were numerous pistol shots fired before Bond fired at all, and undisputedly Bond was shot through the body before he opened fire. In this attitude of the case the dragging into this case of the acts of Kelly in shooting Dunham in the back subsequent to the killing of Green is palpably prejudicial. Of course whatever any of the parties did prior to the killing of Green was competent, but when Green's life went out all acts by the other parties, confederates of Bond, to another person than Green, were clearly inadmissible and improper. According to the state's evidence at the time Kelly shot Dunham, Bond had fled the scene, and he and Adams, the state's witness, were

lying at some distance from the place where Dunham was shot.

In connection with this we will refer now to the arguments of counsel for the prosecution. One of the attorneys for the prosecution said:

"I congratulate the people of Greene county for not having mobbed the defendant, as shown by the trial of Mancey Kelly that this dastardly and devilish deed of shooting Lawrence Dunham in the back was a test."

Under the facts and circumstances of this case it was very prejudicial to refer to the probability or possibility of a mob, as the situation was known to be tense at that time. It was very prejudicial to parade before the jury Kelly's shooting of Dunham, because that subject was not being investigated in this trial. The other statements by this attorney referred to by the majority opinion were also highly prejudicial, especially the statement therein that Kelly had been tried for his life, convicted, and sentenced to be hanged. It was a statement of fact not in evidence of a very prejudicial character. In *Martin* v. *State*, 63 Miss. 505, 56 Am. Rep. 813, it was held that a statement by an attorney of facts not in evidence, and which would have been incompetent as evidence, was reversible error. In the case of *Perkins* v. *Guy*, 55 Miss. 153, 30 Am. Rep. 510, it was held that it was reversible error to make a statement of fact not supported by the evidence.

The district attorney also referred in his argument to Kelly's shooting Dunham in the back, and an appeal made to the jury on that account for an extreme penalty. Of course there could be no justification for the shooting of Dunham in the back after he was down, and his pistol empty, and he was begging for his life, but the present case is entirely a separate affair. It is a case in which the defendant at least had a fighting chance for his life and liberty. It is a matter of regret that in cases of great public excitement that those charged with the administration of law seek rather to inflame than to allay the passions of the hour. As well said by Chief Justice WHITFIELD in

*Tennison* v. *State*, 79 Miss. at page 713, 31 So. 422, discussing a kindred subject:

"It is one of the crowning glories of our law that no matter how guilty one may be, no matter how atrocious his crime, nor how certain his doom, when brought to trial anywhere he shall, nevertheless, have the same fair and impartial trial accorded to the most innocent defendant. Those safeguards, crystallized into the Constitution and laws of the land as the result of the wisdom of centuries of experience, must be, by the courts, sacredly upheld, as well in case of the guiltiest as of the most innocent defendant answering at the bar of his country. And it ought to be a reflection, always potent in the public mind, that, where the crime is atrocious, condemnation is sure, when all these safeguards are accorded the defendant, and therefore the more atrocious the crime the less need is there for any infringement of these safeguards."

In my opinion the case should be reversed and remanded for a fair trial.

Anderson, J., concurs in the foregoing opinion.