KING AND UNITED STATES FIDELITY & GUARANTY CO. *v.* KELLY, MINOR, ETC.

No. 42129　　　　February 19, 1962　　　　137 So. 2d 808

*Snow, Covington & Shows,* Meridian, for appellant, United States Fidelity & Guaranty Company.

162

*J. P. Coleman,* Ackerman, for appellant, Lawrence King.

*Bradford J. Dye,* Grenada; *William Liston,* Winona; *Forrest B. Jackson,* Jackson, for appellee.

Jones, J.

A jury in the Circuit Court of Montgomery County rendered a verdict in favor of appellee in the amount of $9,000. The appellant and the surety on his bond appealed and the appellee cross-appealed, there being three separate assignments of error.

The bonding company says it should have been given a peremptory instruction.

The appellant King complains that the venue should have been changed.

The appellee asserts that the verdict was totally inadequate and that he should have been granted a new trial on the question of damages alone.

The facts as shown by the proof for plaintiff were that on the occasion in question the appellant King was the Sheriff of Montgomery County, Mississippi. William Lee Kelly was his deputy. One witness testified that he was employed by King to kill Kelly, the reason being that, as the witness expressed it, King was "sweethearting" with the wife of Kelly. The witness was the one that with the assistance of another went into the office of the sheriff on the night of January 2, 1960, where Kelly was working and beat him to death with a hammer. This witness testified that the sheriff had offered him money and had also threatened him with a fake prosecution. Furthermore, he stated the sheriff had loaned him a key with which to enter the office.

The sheriff was indicted for murder and the venue was changed to Lauderdale County. In the first trial there was a hung jury. Thereafter and in September, 1960, appellant King entered a plea of guilty and was sentenced to life in the penitentiary.

In this case, King denied the evidence of the State's witness and while he admitted the plea of guilty in the criminal case, he undertook to explain it on the ground that, on advice of counsel and others, he was seeking to avoid the death penalty, but at the same time protesting his innocence.

I.

United States Fidelity and Guaranty Company contends that the evidence should have been excluded as against it and a peremptory instruction entered for

the reason that the evidence failed to show that any act done by the sheriff was an official act, or was done by virtue of or under color of office, or in the performance of an official duty.

Appellee admits the general rule to be that the official bond of a sheriff or other law enforcement officer imposes liability only for what the officer unlawfully does or omits to do in the execution of his office, or of some official duty imposed upon him by law. Appellee admits that the bond does not cover any omission or act done without authority of law, or in his private or personal capacity as a man or a citizen. But says that the action of the sheriff here was under color of office, and seems to rely upon the case of Maryland Casualty Company v. Eaves, 188 Miss. 872, 196 So. 513. In that case the officer was a constable and the testimony showed that he was making an arrest, and after telling the plaintiff he was under arrest, struck him over the eye with a pistol. We think that case is distinguishable from the present case.

In State, etc. v. Lightcap, et al., 181 Miss. 893, 179 So. 880, suit was filed against the sheriff for acts of his deputy, Pigg. The evidence showed that Pigg and two other deputies had gone to Eden in Yazoo County to preserve the peace, complaint having been made of rowdyism there on Saturday night. While there, Pigg entered a store and pulled his pistol and ordered one Johnson, who was doing nothing except being present, to march out in front of him. Johnson accompanied him to an unused filling station. What occurred there between them does not appear. Appellant was informed that Pigg had Johnson under arrest and Johnson desired him to go his bond or do what might be necessary. The appellant went to the filling station and when he arrived there he testified that Johnson told him Mr. Pigg had him and he, Johnson, wanted Dew to pay his fine or whatever it was. Dew asked Pigg if he had him ar-

rested and Pigg said, "No, I want to talk to him." Pigg asked Dew to leave and Dew asked him why he could not hear him talk to the Negro. He said Pigg then backed off eight or ten feet and said, "Well, come over here and I will talk to you," and then began to shoot, and shot at Dew five times. Dew was unarmed and says he neither threatened to make nor made any attack on Pigg. This Court held that there was no liability on the part of the sheriff because Pigg was not acting under color of his office, saying:

"Pigg had no warrant for the arrest of Johnson, and no circumstances appear that would permit his arrest without a warrant, under Section 1227, Code of 1930. These facts alone are not conclusive, but are circumstances to be taken into consideration. Section 1227 requires a person, when making an arrest without a warrant, to 'inform the accused of the object and cause of the arrest, except when he is in the actual commission of the offense, or is arrested on pursuit.' Pigg said nothing indicating that he had arrested Johnson, or intended so to do. On the contrary, when asked by Dew if he had Johnson under arrest, he said, "No, I haven't got him arrested,' and there is no evidence that the contrary is the fact. Moreover, when Pigg informed the appellant, in Johnson's presence, that he did not have Johnson under arrest, he lost any immunity he might theretofore have had, and, since it does not appear that the statement was false, he must be held for all purposes not to have acted thereafter under color of his office."

Taggart, et al v. Peterson, 182 Miss. 82, 181 So. 137, was a suit against the chief of police and his bondsmen. Judgment was rendered for plaintiff but in this Court the judgment was reversed and rendered insofar as the bonding company was concerned. It seems that Peterson and his employee, Willingham, on a Sunday morning on the Streets of Greenville, were engaged in

conversation when Taggart arrested Willingham for improperly parking his automobile. Peterson protested and some conversation occurred between him and Taggart. Taggart notified Peterson that he would be arrested for interfering with an officer in the discharge of his official duty, using violent and profane language. Taggart did not then take either party into custody, but went to headquarters and had charges preferred against them. In the meantime, Peterson had entered a cafe and while seated on a stool, Taggart entered, asking Peterson what he had against him. Peterson replied he had nothing against him and thereupon Taggart struck Peterson, knocking him off the stool and breaking his glasses, while using profane language. His bonding company requested a peremptory instruction (which was refused) on the ground that Taggart was not acting in an official capacity at the time of the assault and that a surety was not liable for the personal acts of an officer. This Court, in reversing and rendering insofar as the bonding company was concerned, said:

"The rule is well settled in this state that sureties on official bonds are not liable for personal torts of officers. In Lizana, et al v. State, Use of Kelly, 109 Miss. 464, 69 So. 292, it was held that, in the absence of a statute, the sureties on official bonds are not liable for exemplary damages. In Pierce v. Chapman, 165 Miss. 749, 143 So. 845, it was held that an officer acting under color of his office is liable for wrongs committed. The court, in this case, quoted from 22 R.C.L., p. 506, section 190, as follows (page 846): 'In a considerable number of cases, the courts have been called upon to decide whether a particular act constituted a wrong or misconduct within the terms of an official bond. Broadly speaking an official bond covers torts committed by the officer under color of his official right. But where an individual is injured by the private and personal acts of an officer, and not by acts which he has done either by virtue

of his office or under color of his office, his sureties are not liable. For example, if a public officer having no process in his hands does an act which he has no right to do, he is not considered as acting officially and therefore the sureties on his official bond are not answerable for his conduct. But if having a valid process he commits a trespass in seizing property not subject to the process, those injured by his acts may proceed against him and the sureties on his official bond. . . . . . . In the books there are to be found much refinement and quibbling in behalf of sureties on official bonds, as to whether the act of the officer was done colore officii, or virtue officii. . . . . . The intricacies of this discussion are satisfactorily avoided by those courts which in accordance with the weight of authority hold that sureties are liable for the acts of an official performed under color of his office as well as for those done by virtue of his office.

"In the case at bar, it is true that the assault would, in all probability, not have occurred if the conversations had not taken place at the time of the arrest. There was no arrest made then, and the interval between the arrest and the assault is not a part of res gestae. We think, therefore, that there was no liability on the part of the United States Fidelity and Guaranty Company, and that its request for a peremptory instruction should have been granted."

 █ In the instant case, it appears from the plaintiff's proof that Sheriff King desired to be rid of his deputy Kelly because he, King, was "sweethearting" with Kelly's wife. We could imagine nothing more personal than this. The lower court erred in refusing to sustain the bonding company's motion.

## II.

Appellant King argues with great force that the court should have granted him a change of venue. The original

suit was filed on March 11, 1960. The bonding company was not made a party defendant to that suit. The process on King shows that it was served by the Sheriff of Hinds County, with King then being under a charge of murder, and evidently being confined in the jail at Jackson. On April 2, 1960, King filed a motion praying that he be not required to answer until the criminal action was terminated. On April 11, 1960, this motion was sustained. At the October 1960 term, after King was sentenced to the penitentiary, the plaintiff moved that answer be required and the defendant was given thirty days in which to answer. The answer was filed on October 27, 1960. On December 28, 1960, plaintiff filed an amended declaration making the surety a party defendant. It was January 28, 1961 before process was lawfully served on the surety and its answer was due on February 28. King was then confined in the penitentiary. On March 27, 1961, at the penitentiary, he swore to a motion for a change of venue and the bonding company, having united in this motion, it was presented on April 10, 1961, the first day of the regular term. This was the first regular term after answer was due.

The court heard no evidence on this motion but on the same day it was filed overruled it on the ground "it was not timely filed." The court held this as a matter of law with no evidence of any sort and in spite of the fact that the bonding company had only recently been made a party and that King had been in the penitentiary continuously since before he was required under order of the court to plead. On April 14, 1961, defendant King filed a supplemental motion for a change of venue, reiterating all the allegations of the original motion and alleging that the facts in this civil case were identical with those in the criminal case on which he had been granted a change of venue, all of which was known to all parties. The defendant King had at all times since he was required to answer been a convict in the

State penitentiary, constantly confined, and that any neglect of his counsel in filing an application should not have been charged to the defendant who was powerless to help himself. This supplemental motion was also overruled on the same day it was filed.

On April 18, 1961, King and his surety filed a motion to quash the petit jury for the second week in which it was alleged that the names for the list were drawn by the judge as follows: 35 from Beat 1, 2 from Beat 2, 3 from Beat 3, 17 from Beat 4, and 3 from Beat 5. Beat 1 was the district in which the cause of action had arisen and where the courthouse was located. The court admitted that the names were drawn as alleged in the motion and that two names were drawn from Beat 1 for every name drawn from any other beat, and that he was doing this in view of knowledge acquired by him as to the registration of the number of qualified electors, and that the boxes for the three smaller beats would soon be exhausted. The motion to quash was overruled.

After the court had made its statement that it had investigated and determined before the jury was drawn that twice the number of names should be drawn from Beat 1 as from any other beat, the defendant renewed his motion for a change of venue. As a matter of fact, the change of venue was presented to the court originally, on a supplemental motion, and on renewals thereof, for a total of six times during the progess of the trial. Of the jurors originally answering for the second week, being 41 in number, one was excused for not being a qualified elector and 22 were excluded because of fixed opinions. At one time there were seven prospective jurors related to either the plaintiff or the defendant, and the defendant moved that all of these be excused. His motion was overruled. Talismen had to be summoned, and many of these were disqualified because of fixed opinions. We are using the count as stated by appellant King in his brief, and which count is unchallenged so

far as we can find in appellee's brief. Not counting a minister and a former deputy of the defendant King, there were 69 jurors called. Of this number 47 had fixed opinions. This was slightly more than 68% of those called, and the plaintiff exhausted his peremptory challenges before the jury was completed.

 █ Under the facts there was no untimely delay in filing the original application for change in venue.

In the case of Owens v. State, 82 Miss. 31, 33 So. 722, it was held that where defendant is indicted in the same county for two offenses in one of which he is entitled to a change of venue, he should, on his application, be granted a change of venue for the trial of the other, if the connection between the two offenses be such that the prejudgment, grudge or ill will which entitled him to the change operated adversely to him in the other case.

Here the civil case arose from the same facts on which King was indicted, and on which he had been given a change of venue. Furthermore, the examination of the jurors and the proceedings in the empanelling of the jury demonstrated that the plaintiff was entitled to a change of venue.

 █ While the decisions on change of venue deal primarily and predominantly with criminal cases, a person is also entitled to a fair and impartial trial in a civil case.

A question as to change of venue arose in the case of Seals v. State, 208 Miss. 236, 44 So. 2d 61, and Judge Roberds in his opinion ably discussed the question of a fair trial. We quote at length from his opinion in that case, as follows:

"In Eddins v. State, 110 Miss. 780, 70 So. 898, 899, the Court said: 'The right to trial by an impartial jury is guaranteed by the organic law of the state, and when it is doubtful that such a jury can be obtained in the county of the venue of the homicide, the person on trial for his life is but asking for his rights when he

requests a change of venue, there is no imaginable reason to refuse, except, possibly, a slight additional cost to the county.'

"In Magness v. State, 103 Miss. 30, 60 So. 8, 10, the Court used this language: 'The requirement of the law is not satisfied by the mere empanelling of 12 men against whom no legal complaint can be made. The defendant is entitled to be tried in a county where a fair proportion of the people qualified for jury service may be used as a venire from which a jury may be secured to try his case fairly and impartially, and uninfluenced by a preponderant sentiment that he should be flung to the lions.'

"In Keeton v. State, 132 Miss. 732, 96 So. 179, 180, this Court said it is not enough that '12 unbiased men may be found in the county to try him. The statute contemplates that the jury shall not only be composed of unbiased and impartial men, but of men who have not been and will not during the trial be subject to the influence of a popular demand for the defendant's conviction.'

"Lastly, in Tennison v. State, 79 Miss. 708, 31 So. 421, 422, the Court gave utterance to this expression: 'It is one of the crowning glories of our law that no matter how guilty one may be, no matter how atrocious his crime, nor how certain his doom, when brought to trial anywhere he shall, nevertheless, have the same fair and impartial trial accorded to the most innocent defendant. Those safeguards, crystallized into the constitution and laws of the land as the result of the wisdom of centuries of experience, must be, by the courts, sacredly upheld, as well in case of the guiltiest as of the most innocent defendant answering at the bar of his county.'

"And to which we might add that under the Constitution of the United States and of this State, Const. U. S. Amend. 6; Const. Miss. 1890, Section 26, accused persons are entitled to a fair and impartial trial. That

means fair, unprejudiced, unbiased individual jurors, who are willing to be guided by the testimony given by the witnesses and the law as announced by the Court. But, a fair trial means more than that. It means, in addition to the right to be tried by such individual jurors, the right to be tried in an atmosphere in which public opinion is not saturated with bias and hatred and prejudice against the defendant; where jurors do not have to overcome that atmosphere, nor the later silent condemnation of their fellow citizens if they acquit the accused. The ascertainment of impartial justice is, or should be, the supreme object of all courts. It is for this purpose they exist and for which they are maintained. It is the object of the courts, as it has been the dream of the sculptors, to symbolize justice as an innocent maiden balancing in her hands the scales of justice, suspended and poised in the open light of day before the world, blinded to bias and prejudice, but ever awake to do fair and impartial justice.

"We now apply these principles to the factual situation above set out. Facts are of much greater weight than opinions. How can an accused obtain a fair trial when sixty-five percent of the jurors examined to try him say they either have fixed opinions, which cannot be changed by evidence, or they are so biased or prejudiced against him they cannot give him a fair trial? Both the State and appellant brief the case on the assumption that the prejudgment of these prospective jurors was that the defendant was guilty of murder. That, no doubt, was the understanding of the jurors who were accepted on the jury and who were in the jury box, as the examination proceeded, listening to this array of men tell the court they thought this man guilty of murder and, in many, if not most, cases that the opinions were so fixed they could not be changed by evidence. It is not conceivable this would not influence those who did serve. Taking as a measurement

the percentage of the examined jurors who thought the defendant guilty, then some sixty-five percent of all the jurors in the county had that preconceived, fixed opinion. It was impossible, in our opinion, for the accused to obtain a fair trial under these conditions.''

██ █ We are convinced that appellant's motion for a change of venue should have been sustained.

### III.

In view of the foregoing disposition of the case, it is unnecessary for us to pass upon the cross-appeal by appellee and the same is dismissed.

### IV.

The facts shown by plaintiff, if true, cause many emotional reactions: Horror at the brutality; sympathy for the child: shame that man, occupying a high pinnacle, may be dropped so low by evil desires; sorrow that the life of a young man was so suddenly and uselessly ended. But we do not judge men; that is for the Highest Court. We pass upon facts as measured by the law, and must at all times retain our equilibrium, to see that the shields erected after centuries of experience to prevent miscarriages of justice are maintained.

To the layman, our action here will probably be called a ''reversal on a technicality'' and he will wonder why this rule should be applied in a case such as this. The man trained in the law will know that we are protecting and preserving for everyone — good, bad, or indifferent — one of the standard safeguards provided for the assurance of a fair trial in all cases. If it should be ignored here, it is destroyed and will not exist at the time of the next trial, regardless of who is the defendant. The same is true of many other so-called ''technicalities.'' When the courts destroy them, if they do, the days of fair trials as we know them are gone.

. As to United States Fidelity & Guaranty Company, reversed and judgment here for appellant; as to appellant King, reversed and remanded with directions to grant a change of venue; as to appellee, cross-appeal dismissed.

*Lee, P.J.,* and *Ethridge, Gillespie* and *McElroy, JJ.,* concur.